**Nos. 12-56067, 12-56068, 12-56077 (Consolidated)**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

THE SAM FRANCIS FOUNDATION, ET AL.,
*Plaintiffs-Appellants*,
v.
CHRISTIE'S, INC.,
*Defendant-Appellee*.

THE SAM FRANCIS FOUNDATION, ET AL.,
*Plaintiffs-Appellants*,
v.
EBAY, INC.,
*Defendant-Appellee*.

ESTATE OF ROBERT GRAHAM, ET AL.,
*Plaintiffs-Appellants*,
v.
SOTHEBY'S, INC.,
*Defendant-Appellee*.

Appeal from the United States District Court for the Central District of California
Nos. 11-cv-8604 JHN (FFMx), 11-cv-8605 JHN (FFMx), 11-cv-8622 JHN (PLAx)
The Honorable Jacqueline H. Nguyen

## JOINT BRIEF OF APPELLEES CHRISTIE'S, INC. & SOTHEBY'S, INC.

JASON D. RUSSELL
HILLARY A. HAMILTON
ALLON KEDEM
MICHAEL MCINTOSH
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
300 South Grand Avenue
Suite 3400
Los Angeles, CA 90071
Tel: 213.687.5000
Fax: 213.687.5600

Attorneys for Appellee
Christie's, Inc.

STEVEN A. REISS
HOWARD B. COMET
WEIL, GOTSHAL &
MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: 212.310.8000
Fax: 212.310.8007

Attorneys for Appellee
Sotheby's, Inc.

PAUL T. FRIEDMAN
DEANNE E. MAYNARD
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel: 415.268.7000
Fax: 415.268.7522

Attorneys for Appellee
Sotheby's, Inc.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellees represent as follows:

Appellee Christie's, Inc. is a privately held company. There is no publicly held corporation owning 10% or more of its stock.

Appellee Sotheby's, Inc. is a wholly owned subsidiary of Sotheby's, which is a publicly held corporation.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...............................................................iii

ISSUES ......................................................................................xiii

NOTICE OF ADDENDUM .............................................................xiii

INTRODUCTION ............................................................................ 1

FACTS ........................................................................................... 3

I.     THE CALIFORNIA RESALE ROYALTY ACT ........................... 3

II.    THE ACT'S LEGISLATIVE HISTORY ...................................... 5

III.   DISMISSAL OF PLAINTIFFS' ACTIONS ................................. 7

SUMMARY OF ARGUMENT ............................................................ 9

ARGUMENT .................................................................................. 12

I.     THE DISTRICT COURT CORRECTLY RULED THAT THE CRRA
       VIOLATES THE COMMERCE CLAUSE .................................. 12

       A.    The CRRA Explicitly Regulates Art Sales Occurring Outside
             California. ............................................................... 14

       B.    The Practical Effect Of The CRRA Is To Control Commerce
             Beyond California's Borders. ........................................ 26

II.    THE CRRA CANNOT BE UPHELD AS A TAX LAW ............... 31

       A.    Plaintiffs Waived Their New Tax Argument. ................... 32

       B.    The CRRA Is Not A Tax Law. ....................................... 33

       C.    Plaintiffs' Tax Theories Are Wrong. .............................. 35

             1.    States Cannot Tax Out-Of-State Transactions. ......... 36

             2.    Plaintiffs' Nexus Argument Is Wrong. ................... 41

3.      Plaintiffs' *Complete Auto* Argument Is Wrong.........................45

(a)     There Is No Substantial Nexus To California. ...............46

(b)     The CRRA Cannot Be Fairly Apportioned.....................47

(c)     The Royalty Is Not Related To State Services. ..............50

D.      The CRRA Does Not Provide For A Valid Collection Duty.............51

III.    THE DISTRICT COURT CORRECTLY RULED THAT THE CRRA'S UNCONSTITUTIONAL PROVISION CANNOT BE SEVERED...................................................................................53

IV.     PLAINTIFFS' CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT ....................................................................................58

A.      Plaintiffs' Claims Conflict With The Copyright Act's First-Sale Doctrine. ...........................................................60

B.      The First-Sale Doctrine Forbids Restraints On The Resale Of Copyrighted Works..........................................................61

C.      The CRRA Conflicts With The First-Sale Doctrine............................64

D.      The Copyright Act Expressly Preempts Plaintiffs' Claims.................69

1.      Plaintiffs' Claims Fall Within The Subject Matter Of The Copyright Act. ........................................................70

2.      Plaintiffs Allege Violations Of State-Law Rights Equivalent To Rights Contained In The Copyright Act. ..........70

CONCLUSION ....................................................................................73

STATEMENT OF RELATED CASES ...................................................74

CERTIFICATE OF COMPLIANCE ......................................................75

ADDENDUM .......................................................................................76

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abbott Laboratories v. Franchise Tax Board,*
   175 Cal. App. 4th 1348 (2009) ...................................................... 55, 56

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
   677 F.3d 60 (2d Cir. 2012) .............................................................. 20

*Allied Signal, Inc. v. Director,*
   504 U.S. 768 (1992) .................................................................... 46, 50

*American Booksellers Foundation v. Dean,*
   342 F.3d 96 (2d Cir. 2003) .............................................................. 28

*American Civil Liberties Union of Nevada v. Heller,*
   378 F.3d 979 (9th Cir. 2004) ........................................................... 52

*American Oil Co. v. Neill,*
   380 U.S. 451 (1965) ....................................................................... 37

*Amoco Oil Co. v. United States,*
   234 F.3d 1374 (Fed. Cir. 2000) ....................................................... 16

*Arizona v. Components Inc.,*
   66 F.3d 213 (9th Cir. 1995) ............................................................. 33

*Associated Industries of Missouri v. Lohman,*
   511 U.S. 641 (1994) ....................................................................... 47

*Baby Moose Drawings, Inc. v. Valentine,*
   No. 2:11-CV-00697-JHN,
   2011 WL 1258529 (C.D. Cal. Apr. 1, 2011) ................................... 71

*Baldwin v. G. A. F. Seelig, Inc.,*
   294 U.S. 511 (1935) .......................................................... 14, 19, 25

iii

*Barlow v. Davis*,
    72 Cal. App. 4th 1258 (1999) .................................................................. 55

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) ............................................................................... 19

*Bloomingdale Bros. v. Chu*,
    70 N.Y.2d 218 (1987) ............................................................................. 44

*Bobbs-Merrill Co. v. Straus*,
    210 U.S. 339 (1908) ............................................................................... 64

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
    489 U.S. 141 (1989) ............................................................................... 60

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004) ................................................................... 70

*Bricker v. Rockwell International Corp.*,
    22 F.3d 871 (9th Cir. 1993) .................................................................... 31

*Brilliance Audio, Inc. v. Haights Cross Communications, Inc.*,
    474 F.3d 365 (6th Cir. 2007) ..................................................... 62, 65, 71

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*,
    476 U.S. 573 (1986) ....................................................................... 13, 26

*California Redevelopment Ass'n v. Matosantos*,
    53 Cal. 4th 231 (2011) ........................................................................... 56

*California Teachers Ass'n v. State Board of Education*,
    271 F.3d 1141 (9th Cir. 2001) ................................................................ 52

*Carolina Trucks & Equipment, Inc. v. Volvo Trucks of North America, Inc.*,
    492 F.3d 484 (4th Cir. 2007) .......................................................... 15, 20

*Cedyco Corp. v. Petroquest Energy, LLC*,
    497 F.3d 485 (5th Cir. 2007) .................................................................. 17

*Central Greyhound Lines, Inc. of New York v. Mealey*,
334 U.S. 653 (1948) ........................................................................ 47

*Colonial Pipeline Co. v. Traigle*,
421 U.S. 100 (1975) ........................................................................ 36

*Commodities Recovery Corp. v. United States*,
34 Fed. Cl. 282 (1995) .................................................................... 17

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ............................................................ 58, 60, 69

*Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*,
275 U.S. 87 (1927) .......................................................................... 37

*Complete Auto Transit Inc. v. Brady*,
430 U.S. 274 (1977) ...............................................................*passim*

*Connecticut General Life Insurance Co. v. Johnson*,
303 U.S. 77 (1938) ........................................................ 36, 37, 50, 51

*Conservation Force, Inc. v. Manning*,
301 F.3d 985 (9th Cir. 2002) .......................................................... 13

*County of Sonoma v. Superior Court*,
173 Cal. App. 4th 322 (2009) .................................................... 54, 55

*Dean Foods Co. v. Brancel*,
187 F.3d 609 (7th Cir. 1999) ...................................................... 17, 19

*Doss, Inc. v. Christie's, Inc.*,
No.08 CIV. 10577LAP,
2009 WL 3053713 (S.D.N.Y. Sept. 23, 2009) ................................ 21

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) ........................................................ 13, 14, 20, 25

*Felt & Tarrant Manufacturing Co. v. Gallagher*,
306 U.S. 62 (1939) .......................................................................... 33

v

*Gemtel Corp. v. Community Redevelopment Agency of Los Angeles*,
  23 F.3d 1542 (9th Cir. 1994) ............................................................ 60

*General Motors Corp. v. Washington*,
  377 U.S. 436 (1964) ........................................................................ 49

*In re George*,
  361 F.3d 1157 (9th Cir. 2004) ........................................................ 33

*Goldberg v. Sweet*,
  488 U.S. 252 (1989) ........................................................................ 39

*Gravquick A/S v. Trimble Navigation International Ltd.*,
  323 F.3d 1219 (9th Cir. 2003) ................................................... 21, 22

*Great Atlantic & Pacific Tea Co. v. Cotrell*,
  424 U.S. 366 (1976) .................................................................. 13, 26

*Great Atlantic & Pacific Tea Co. v. Grosjean*,
  301 U.S. 412 (1937) ........................................................................ 36

*Healy v. Beer Institute, Inc.*,
  491 U.S. 324 (1989) ........................................... 9, 14, 19, 26, 28

*Henneford v. Silas Mason Co.*,
  300 U.S. 577 (1937) .................................................................. 38, 40

*Hessel v. Christie's Inc.*,
  399 F. Supp. 2d 506 (S.D.N.Y. 2005) ............................................ 17

*Hotel Employees & Restaurant Employees International Union v. Davis*,
  21 Cal. 4th 585 (1999) ............................................................ 11, 53, 58

*Hoye v. City of Oakland*,
  653 F.3d 835 (9th Cir. 2011) .......................................................... 16

*HP Hood & Sons, Inc. v. Du Mond*,
  336 U.S. 525 (1949) ........................................................................ 12

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   133 S. Ct. 1351 (2013) .................................................................*passim*

*Kopp v. Fair Political Practices Committee*,
   11 Cal. 4th 607 (1995) ........................................................... 58

*Laws v. Sony Music Entertainment, Inc.*,
   448 F.3d 1134 (9th Cir. 2006) ........................................ 69, 70, 71, 72

*Leavitt v. Jane L.*,
   518 U.S. 137 (1996) ............................................................... 53

*McLeod v. J.E. Dilworth Co.*,
   322 U.S. 327 (1944) ....................................................37, 38, 40, 44, 47

*Memphis National Gas Co. v. Stone*,
   335 U.S. 80 (1948) ................................................................ 36

*Metromedia, Inc. v. City of San Diego*,
   32 Cal. 3d 180 (1982) ............................................................ 55

*Midwest Title Loans, Inc. v. Mills*,
   593 F.3d 660 (7th Cir. 2010) ....................................... 17, 18, 19, 24, 31

*Miller Bros. Co. v. Maryland*,
   347 U.S. 340 (1954) ........................................................... 37, 43

*Montalvo v. Spirit Airlines*,
   508 F.3d 464 (9th Cir. 2007) ................................................... 59

*Montgomery Ward & Co. v. State Board of Equalization*,
   272 Cal. App. 2d 728 (1969) ................................................... 40

*Morseburg v. Balyon*,
   621 F.2d 972 (9th Cir. 1980) ................................................ 66, 67

*National Bellas Hess, Inc. v. Illinois Department of Revenue*,
   386 U.S. 753 (1967) .............................................................. 52

vii

*National Collegiate Athletic Ass'n v. Miller,*
    10 F.3d 633 (9th Cir. 1993)..............................................................*passim*

*National Federation of Independent Business v. Sebelius,*
    132 S. Ct. 2566 (2012) .......................................................... 33

*National Geographic Society v. California Board of Equalization,*
    430 U.S. 551 (1977) ..........................................................39, 40, 43

*National Geographic Society v. State Board of Equalization,*
    16 Cal. 3d 637 (1976)......................................................... 44

*National Solid Wastes Management Ass'n v. Meyer,*
    63 F.3d 652 (7th Cir. 1995)................................................. 28

*Nelson v. Sears Roebuck & Co.,*
    312 U.S. 359 (1941) ..........................................................33, 40, 52

*New York ex. rel. Cohn v. Graves,*
    300 U.S. 308 (1937) .......................................................... 41

*Norfolk & Western Railway Co. v. Missouri State Tax Commission,*
    390 U.S. 317 (1968) .......................................................... 36

*Norton Co. v. Department of Revenue of Illinois,*
    340 U.S. 534 (1951) .......................................................... 37

*Oklahoma Tax Commission v. Jefferson Lines, Inc.,*
    514 U.S. 175 (1995) ........................................................ 37, 48, 49, 50

*Parfums Givenchy, Inc. v. C&C Beauty Sales, Inc.,*
    832 F. Supp. 1378 (C.D. Cal. 1993)..................................... 66

*Pharmaceutical Research & Manufacturers of America v. Walsh,*
    538 U.S. 644 (2003) .......................................................... 14

*Preservation Coalition, Inc. v. Pierce,*
    667 F.2d 851 (9th Cir. 1982).............................................. 16

viii

*Quality King Distributors, Inc. v. L'Anza Research International, Inc.*,
   523 U.S. 135 (1998) ................................................................61, 65, 67

*Quik Payday, Inc. v. Stork*,
   549 F.3d 1302 (10th Cir. 2008) ......................................................... 22

*Quill Corp. v. North Dakota*,
   504 U.S. 298 (1992) .....................................................................32, 39, 52

*Rivera v. Fresno*,
   6 Cal. 3d 132 (1971) ........................................................................ 39

*S.D. Myers, Inc. v. City & County of San Francisco*,
   253 F.3d 461 (9th Cir. 2001)......................................... 15, 22, 23, 29

*Schmidt v. Burlington Northern & Santa Fe Railway Co.*,
   605 F.3d 686 (9th Cir. 2010)............................................................ 32

*Scripto, Inc. v. Carson*,
   362 U.S. 207 (1960) ......................................................................... 52

*Shell Oil Co. v. State Board of Equalization*,
   64 Cal. 2d 713 (1966) ...................................................................... 37

*Singleton v. Wulff*,
   428 U.S. 106 (1976) ......................................................................... 60

*Smith v. Phillips*,
   455 U.S. 209 (1982) ......................................................................... 60

*Sony Corp. of America v. University City Studios, Inc.*,
   464 U.S. 417 (1984) .....................................................................60, 68

*Southern Pacific Co. v. Arizona*,
   325 U.S. 761 (1945) ......................................................................... 28

*St. Louis Cotton Compress Co. v. Arkansas*,
   260 U.S. 346 (1922) ......................................................................... 51

*Stengel v. Medtronic, Inc.*,
    704 F.3d 1224 (9th Cir. 2013) ......................................................... 12, 60

*Sullivan v. Oracle Corp.*,
    51 Cal. 4th 1191 (2011) ............................................................................ 15

*Taylor v. Westly*,
    402 F.3d 924 (9th Cir. 2005) ................................................................... 34

*Travelers Property Casualty Co. of America v. ConocoPhillips Co.*,
    546 F.3d 1142 (9th Cir. 2008) ................................................................. 32

*Tyler Pipe Industries, Inc. v. Washington State Department of Revenue*,
    483 U.S. 232 (1987) .................................................................................. 49

*UMG Recordings, Inc. v. Augusto*,
    628 F.3d 1175 (9th Cir. 2011) ............................................................ 61, 66

*Union Refrigerator Transit Co. v. Kentucky*,
    199 U.S. 194 (1905) .................................................................................. 38

*United States v. Butler*,
    297 U.S. 1 (1936) ................................................................................ 33, 34

*United States v. National Treasury Employees Union*,
    513 U.S. 454 (1995) .................................................................................. 52

*Valley Bank of Nevada v. Plus System, Inc.*,
    914 F.2d 1186 (9th Cir. 1990) ................................................................. 24

*Vernor v. Autodesk, Inc.*,
    621 F.3d 1102 (9th Cir. 2010) ................................................................. 71

*Wardair Canada, Inc. v. Florida Department of Revenue*,
    477 U.S. 1 (1986) ...................................................................................... 37

*West Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994) .................................................................................. 47

*Williams v. Vermont*,
  472 U.S. 14 (1985) ............................................................ 47

*Woosley v. California*,
  3 Cal. 4th 758 (1992) ....................................................... 47

*Zango, Inc. v. Kaspersky Lab, Inc.*,
  568 F.3d 1169 (9th Cir. 2009) ......................................... 16

## **CONSTITUTIONS, STATUTES, AND LEGISLATIVE MATERIALS**

17 U.S.C. § 101 ................................................................... 62

17 U.S.C. § 106(3) ....................................................12, 59, 62

17 U.S.C. § 109(a).....................................................11, 59, 62

17 U.S.C. § 301(a).....................................................12, 59, 69

28 U.S.C. § 2403(b) ............................................................. 8

Cal. Civ. Code § 986 ................................................*passim*

Cal. Com. Code § 2328........................................................ 16

Cal. Rev. & Tax. Code § 6201 ........................................... 41

Cal. Rev. & Tax. Code § 6203(a)....................................... 52

Cal. Rev. & Tax. Code § 18151 ......................................... 41

H.R. Rep. No. 94-1476 (1976) .......................................... 63

N.Y. U.C.C. § 2-328 ........................................................... 16

S. Rep. No. 94-473 (1975).................................................. 63

U.S. Const. art. I, § 8, cl. 3 ................................................ 12

# OTHER AUTHORITIES

2 *Nimmer on Copyright* § 8C.04 (rev. ed. 2013)......................................66

2 William F. Patry, *Copyright Law and Practice* (1994) .........................66

Brief of Petitioner*, McLeod v. J.E. Dilworth Co.*,
    322 U.S. 349 (1944) (No. 311), 1944 WL 42800..................................44

Brief of Respondent*, McLeod v. J.E. Dilworth Co.*,
    322 U.S. 349 (1944) (No. 311), 1944 WL 42801..................................44

Dan. T. Coenen, *Constitutional Law: The Commerce Clause* 222 (2004)........35, 46

Erwin Chemerinsky, *Constitutional Law: Principles & Policies* § 5.4.1 (4th ed.
    2011) ........................................................................................35

Restatement (First) of Conflict of Laws § 330........................................20

Shira Perlmutter, *Resale Royalties for Artists: An Analysis of the Register of
    Copyrights' Report*, 16 Colum.-VLA J.L. & Arts 395 (1991-92) .......................49

Stephanie B. Turner, *The Artist's Resale Royalty Right: Overcoming the
    Information Problem*, 19 UCLA Ent. L. Rev. 329 (2012)...................................49

## ISSUES

The California Resale Royalty Act, Cal. Civ. Code §986, imposes obligations on certain art sales throughout the United States. It requires that, when (1) a work of fine art is sold any place in the United States by a California resident or (2) a work of fine art is sold in California, the seller or the seller's agent must withhold 5% of the gross sale price, attempt to locate the artist, and pay the withheld amount to the artist (wherever he or she is) or, if the artist cannot be found, to the California Arts Council.

1. Did the District Court correctly determine that the Commerce Clause of the United States Constitution prevents application of the California Resale Royalty Act to sales in other states?

2. Did the District Court correctly determine that, if the application of the California Resale Royalty Act to out-of-state sales is unconstitutional, the offending portion of the Act cannot be severed because the California Legislature would not have enacted a version of the law that applied only to in-state sales?

3. Does the Copyright Act of 1976 preempt Plaintiffs' claims and provide an alternative basis for affirming the District Court?

## NOTICE OF ADDENDUM

This appeal involves interpretation of the California Resale Royalty Act, attached as an Addendum. *See* 9th Cir. R. 28-2.7.

xiii

## INTRODUCTION

The issue in this appeal is straightforward: May the state of California regulate a business transaction that occurs in another state, simply because one of the parties to the transaction is a California resident? Under settled law, the answer is "No." Yet the statute invoked by Plaintiffs, the California Resale Royalty Act ("CRRA" or "Act"), does just that. Whenever a work of fine art is sold by a California resident in another state, the Act requires the seller or the seller's agent to locate the artist (regardless of where the artist lives) and pay him or her 5% of the gross sale price. Under the Act, sales that wholly occur in another state—offer, acceptance, completion—are subject to California's control.

As the Supreme Court has made clear, this sort of extraterritorial regulation violates the Commerce Clause of the United States Constitution. States may not regulate transactions that occur beyond their borders; nor may they use their regulatory powers to control out-of-state conduct. As the District Court correctly held, the CRRA violates these principles by directly regulating art sales that take place outside California. The fact that a California resident is the seller is immaterial. A California resident who opens a restaurant in New York must abide by New York's health codes, not California's.

With no good answer to the District Court's correct application of settled law, Plaintiffs have fashioned a new tax-based argument to try to salvage their

CRRA claims. Plaintiffs did not make the tax argument below, and for good reason: it is wrong. The CRRA raises no tax revenue and is not a tax law. Even if it were, the Commerce Clause also bars states from taxing out-of-state conduct, regardless of whether a state resident is involved. Plaintiffs analogize the CRRA to a use tax, but use taxes are based on the use of previously purchased property in the taxing state, whereas the CRRA applies irrespective of where the art is to be used. The Act applies to any "art sale" that "occurs in another state" whenever a Californian is the seller. Plaintiffs' Br. at 27. Therefore, California cannot require state residents to pay CRRA royalties for out-of-state sales, nor may it compel auction houses to withhold royalty amounts from the sellers or hold them liable for not doing so.

Because the CRRA cannot be applied to sales in other states, the question arises whether the California Legislature would have adopted an Act that applies only to in-state sales. Plainly, it would not, as such a law would drive the art market from California. Indeed, the Legislature deliberately expanded the Act's scope to reach out-of-state sales for precisely that reason. Accordingly, the invalid extraterritorial portion of the Act cannot be severed from the rest of the Act, and the entire statute is unenforceable.

Finally, there is another, independent basis for this Court to affirm the judgment: The CRRA is preempted by the Copyright Act of 1976. The Copyright

Act codifies the long-standing "first-sale" doctrine, under which a copyright-holder (such as an artist) who sells a copyrighted work (such as a painting) relinquishes the ability to restrict the resale of that work. The CRRA conflicts with the first-sale doctrine by dictating the terms of subsequent sales and statutorily granting copyright owners a financial interest in sales beyond the first sale, rendering the Act invalid under settled principles of conflict preemption. Moreover, because Plaintiffs' state-law claims allege nothing more than the unlawful distribution of their copyrighted works, they are expressly preempted by the Copyright Act.

**FACTS**

## I.    THE CALIFORNIA RESALE ROYALTY ACT

The CRRA regulates the resale of "[f]ine art"—"an original painting, sculpture, or drawing, or an original work of art in glass." Cal. Civ. Code §986(c)(2).[1] The Act provides that, after the initial sale of a work by the artist, "[w]henever a work of fine art is sold and the seller resides in California or the sale takes place in California, the seller or the seller's agent shall pay to the artist of such work of fine art or to such artist's agent 5 percent of the amount of such sale." *Id.* §§986(a) & (b)(1). The Act thus has two prongs: an *out-of-state sales*

---

[1]    A copy of Cal. Civ. Code §986 is attached as an addendum to this brief. "ER" refers to the Excerpts of Record filed in this Appeal. All emphasis is added and internal quotation marks, citations, and brackets omitted unless otherwise noted.

3

*provision* that applies to out-of-state sales if "the seller resides in California" and an *in-state sales provision* that applies if "the sale takes place in California." *Id.* §986(a).

An "[a]rtist" is "the person who creates a work of fine art and who, at the time of resale, is a citizen of the United States, or a resident of the state who has resided in the state for a minimum of two years." *Id.* §986(c)(1). The Act thus applies to all artists who are U.S. citizens, wherever in the world they reside. Indeed, one of the named plaintiffs, Chuck Close, lives in New York. ER1800, ER1813. The CRRA also allows an heir to assert an artist's royalty rights for 20 years after the artist's death. Cal. Civ. Code §986(a)(7). Two other plaintiffs are the representatives of deceased artists. ER1800, ER1813.

If an artist's work is re-sold "at an auction or by a gallery, dealer, broker, museum, or other person acting as the agent for the seller," the CRRA requires that "the agent shall withhold 5 percent of the amount of the sale, locate the artist and pay the artist." Cal. Civ. Code §986(a)(1). An artist can "waive[]" his or her right to a resale royalty "only by a contract in writing providing for an amount in excess of 5 percent of the amount of such sale"; the artist cannot choose to accept less. *Id.* §986(a). An artist who seeks to enforce his or her rights under the CRRA "may bring an action for damages within three years after the date of sale or one year after the discovery of the sale, whichever is longer." *Id.* §986(a)(3).

The CRRA does not apply in certain situations, including when (1) the gross sales price is less than $1,000, or (2) the artwork is re-sold for less than the original purchase price paid by the seller. *Id.* §§986(b)(2) & (4). For all sales to which the CRRA applies, it requires the seller or agent to pay a royalty of 5% of the gross sales price, without any deduction for expenses incurred in the resale (*e.g.*, commissions, shipping, insurance).

If the seller or agent cannot find the artist within 90 days, it must pay the royalty to the California Arts Council, which then must "attempt to locate" the artist. *Id.* §§986(a)(2) & (5). After seven years, if the artist has not filed a claim for the royalty and the Arts Council has failed to find him or her, "the right of the artist terminates and such money shall be transferred" to the Arts Council to "use in acquiring fine art." *Id.* §986(a)(5).

## II.  THE ACT'S LEGISLATIVE HISTORY

The CRRA was introduced by Assemblyman Sieroty in 1975. ER562. It initially required a resale royalty only when "an original work of fine art [was] sold at an auction or by a gallery or museum in California." ER563. Sales occurring beyond California's borders were outside the scope of the proposed law. ER573.

In response to the California-sales-only bill, art law expert and Stanford law professor John Merryman warned the Legislature that, as drafted, the bill would "encourage sellers to consign works to dealers and auction houses outside

5

California, since it can only apply to California sales." ER577. Accordingly, the proposed bill was amended to apply "[w]henever a work of fine art is sold *and the buyer or the seller resides in California or the sale takes place* in California." ER581 (emphasis in original). The bill was later amended again to delete California buyers, but it continued to require royalties for sales outside California if the seller was a California resident. ER594.

Before the bill passed, Legislative Counsel George Murphy advised Sieroty and the Governor that the extraterritorial reach of the bill "would constitute an undue burden on interstate commerce in contravention of the Federal Constitution in its application to sales which occur outside the State of California." ER585, ER589-91, ER603. Despite this warning of unconstitutionality, the Legislature enacted the bill with the extraterritorial provision intact, and the CRRA became effective in 1977. Cal. Civ. Code §986(d).

The CRRA was—and is—the only law of its kind in the United States. Since the 1970s, *at least fifteen other states have considered whether to adopt resale royalty legislation, and all have declined to do so*. ER1387-90, ER1410, ER1516, ER1600, ER1604, ER1637, ER1640. For example, New York (where defendants Christie's and Sotheby's reside) has considered legislation imposing a resale royalty over ten times; the legislature *rejected* the proposed legislation each time, most recently in 2010. ER1269, ER1271-72, ER1285-90, ER1325-29,

ER1336-38, ER1341-43, ER1346-51, ER1354-56, ER1359-61, ER1364-66, ER1369-71, ER1374-76, ER1379-81. The CRRA thus is the only statute of its kind in American art law, and intentionally so.

## III. DISMISSAL OF PLAINTIFFS' ACTIONS

On October 18, 2011, Plaintiffs filed essentially identical putative class action complaints against Christie's and Sotheby's, both of which are New York auction houses (the "Auction Houses"), and eBay, the operator of an online marketplace. ER1800, ER1814, ER1825. Plaintiffs claimed that the Auction Houses sold works of art on behalf of California residents, or acted as the seller's agent for sales in California, but did not withhold the 5% royalty or provide it to artists in compliance with the CRRA. ER1801-06, ER1814-18. Each complaint also alleged a violation of California's Unfair Competition Law, Business and Professions Code section 17200 ("UCL"), based on the Auction Houses' alleged "willful failure to comply with the [CRRA]." Plaintiffs sought royalties and interest, punitive damages, attorneys' fees, and injunctive relief. ER1807-09, ER1819-22.

On January 12, 2012, the Auction Houses moved to dismiss Plaintiffs' complaints. They identified a number of legal deficiencies, including that the CRRA violated the Commerce Clause and the Takings Clause of the U.S. and California Constitutions, and that the CRRA was preempted by the Copyright Act

of 1976. ER1670-1734. The District Court invited the California Attorney General "to intervene . . . for argument on the question of [the CRRA's] constitutionality" pursuant to 28 U.S.C. §2403(b), but California did not do so. *See* Dist Ct. 11-cv-8604, Dkt. 22; Dist Ct. 11-cv-8605, Dkt. 19.

On May 17, 2012, the District Court issued a nineteen-page opinion dismissing Plaintiffs' claims with prejudice on the ground that the CRRA "violates the Commerce Clause of the United States Constitution." ER25. Judge Nguyen held that the out-of-state sales provision "purports to regulate" and control the terms of "art sale transactions throughout the United States," thereby "substantially" affecting interstate commerce. ER16-17. The District Court further held that the law "explicitly regulates applicable sales of fine art occurring wholly outside California" and that, "[u]nder its clear terms, the CRRA regulates transactions occurring anywhere in the United States, so long as the seller resides in California." ER19. Judge Nguyen emphasized that "the CRRA has the practical effect of controlling commerce occurring wholly outside the boundaries of California," rendering it invalid under the Commerce Clause. ER22.

The District Court further held that the out-of-state sales portion of the CRRA could not be severed. The District Court carefully reviewed the CRRA's legislative history. The California Legislature rejected a version of the Act limited to sales within California because it would have caused the art market to "fle[e] the

state to avoid paying the 5% royalty." ER24. Instead, the Legislature added the out-of-state sales provision, despite the Legislative Counsel's warning about its unconstitutionality. ER22-24. "Were the Court merely to sever the extraterritorial provisions of the statute, it would create a law that the legislature clearly never intended to create." ER24.

The District Court declined to "address Defendants' preemption and Takings Clause arguments," which had been fully briefed by both sides, because the CRRA failed to "withstand Commerce Clause scrutiny." ER9.

## SUMMARY OF ARGUMENT

No state may regulate commerce in another state. A state law that governs conduct "wholly outside of the State's borders" or that has the "practical effect of . . . control[ling] conduct beyond the boundaries of the State" is *per se* invalid. *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). Plaintiffs concede that the CRRA's out-of-state sales provision applies solely to "auction transactions occurring *outside* of California." Plaintiffs' Br. at 29. As the District Court held, such out-of-state sales lie beyond the State's authority.

Plaintiffs rest on the novel and entirely unsupported theory that a state may regulate transactions beyond its borders whenever its residents are involved. This theory conflicts with well-established Commerce Clause principles, which focus on the relationship between the legislating state and the *activity* to be governed, not

9

the residency of the participants.  A Californian who opens a restaurant in New York must comply with New York's health codes, not California's.  Because the CRRA directly regulates art sales that occur in other states, it is invalid as to those extraterritorial applications.

Ignoring these well-established principles for determining the validity of state regulation of economic activity, Plaintiffs rely on precedents regarding state taxation authority.  These tax arguments are waived—because Plaintiffs never raised them below—and are also wrong.  The CRRA is not a tax law, as it does not produce the essential feature of any tax, which is government revenue.  And even if the CRRA somehow were a tax (which it is not), the Commerce Clause prohibits states from taxing sales or transactions that occur in other states, even if the buyer or seller is a resident of the taxing state.  Here, as Plaintiffs admit, they are seeking to apply the CRRA to transactions that occurred in another state.

Plaintiffs also cannot save the CRRA by analogizing it to a use tax, which is a tax based on post-sale use of the purchased item in the taxing state.  Setting aside that the CRRA is not a tax law at all, its applicability does not depend on whether the purchased art is brought to and used in California—the quintessential feature of any valid use tax.  And, of course, because California cannot validly require state residents to pay CRRA royalties based on out-of-state sales, California also cannot

require the Auction Houses to withhold royalty amounts for such sales (or hold the Auction Houses liable for not doing so).

Finally, because the CRRA cannot be applied to art sales that occur outside California, the question arises whether the remainder of the Act may be enforced. Under California law, a court cannot rewrite a statute to excise the unconstitutional portions—even a statute, such as the CRRA, that has a severability clause—unless the remainder is "volitionally separable." *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 21 Cal.4th 585, 613 (1999). Here, the out-of-state sales provision is not volitionally separable because the California Legislature would not have enacted a version of the law that applies solely to in-state sales. Indeed, the Legislature chose not to enact a proposed California-sales-only law after being warned that it would destroy California's art market. The District Court properly declined to rewrite the statute and dismissed Plaintiffs' claims.

Plaintiffs' claims also fail for another reason: They are preempted by the Copyright Act of 1976. The Copyright Act strikes a delicate balance between the distribution rights of copyright holders and the unencumbered resale of copyrighted works. The Copyright Act's "first-sale" doctrine enshrines this balance. *See* 17 U.S.C. §109(a). The first-sale doctrine gives a copyright owner the right to receive fair market value from an initial sale, but precludes the copyright owner from controlling or restricting subsequent sales. *Kirtsaeng v.*

11

*John Wiley & Sons, Inc.*, 133 S.Ct. 1351, 1363 (2013). The CRRA, however, dictates the terms of downstream sales. The CRRA thus "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and is preempted as a matter of conflict preemption. *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1231 (9th Cir. 2013) (en banc).

The CRRA likewise fails on the basis of express preemption. The Copyright Act includes an express-preemption provision, which prevents states from creating rights that fall within its subject matter and general scope. 17 U.S.C. §301(a). The CRRA grants certain copyright holders (visual artists) a financial right in the distribution of their work. But the Copyright Act already confers distribution rights on copyright owners. 17 U.S.C. §106(3). Because the CRRA creates rights equivalent to those protected by the Copyright Act, it is expressly preempted.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY RULED THAT THE CRRA VIOLATES THE COMMERCE CLAUSE

Prior to ratification of the Constitution, each state was free to regulate or restrict commerce as it saw fit. The resulting legal patchwork produced "a drift toward anarchy and commercial warfare between states." *HP Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533 (1949). In response, the Founders assigned Congress the authority "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, §8, cl. 3. Implicit in this "affirmative grant of

regulatory power to Congress" was a "negative aspect, referred to as the dormant Commerce Clause." *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 991 (9th Cir. 2002). The dormant Commerce Clause is a "limitation upon the power of the States," ensuring that state autonomy over "local needs" does not inhibit "the overriding requirement of freedom for the national commerce." *Great Atl. & Pac. Tea Co. v. Cotrell*, 424 U.S. 366, 370-71 (1976).

In cases involving "state economic regulation," the Supreme Court has adopted a categorical approach: "When a state statute directly regulates . . . interstate commerce, . . . we have generally struck down the statute without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). Under this approach, the reviewing court asks whether the challenged state statute "directly regulates interstate commerce." *Nat'l Collegiate Athletic Ass'n v. Miller ("NCAA")*, 10 F.3d 633, 638 (9th Cir. 1993). If so, "it violates the Commerce Clause *per se*," and the court "must strike it down without further inquiry." *Id.*; *see Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982) (plurality) ("The Commerce Clause . . . permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited." (emphasis in original)).

The District Court correctly determined that the CRRA violates the Commerce Clause by directly regulating interstate commerce. Direct regulation

can occur in two ways. First, regulation is direct if it governs "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336 (quoting *Edgar*, 457 U.S. at 642-43). Second, state law directly regulates interstate commerce where the "practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.* Under either inquiry, the CRRA is an impermissible direct regulation.

### A. The CRRA Explicitly Regulates Art Sales Occurring Outside California.

Under the Commerce Clause, no state may pass a law that "directly regulates and prevents, unless its terms are satisfied," transactions in another state. *Edgar*, 457 U.S. at 640 (plurality). A state's effort to regulate activity beyond its borders is *per se* invalid because it "exceeds the inherent limits of the enacting State's authority." *Healy*, 491 U.S. at 336. Justice Cardozo crystalized this common-sense notion with his "classic observation that 'New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there.'" *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003) (quoting *Baldwin v. G. A. F. Seelig, Inc.*, 294 U.S. 511, 521 (1935)).

This Court accordingly has invalidated state laws that regulate conduct in other states. In *NCAA*, for instance, this Court addressed a Nevada law that sought to impose procedures on disciplinary hearings by any national collegiate athletic association. When the NCAA brought disciplinary proceedings against four

14

Nevada residents, they "asserted their right to have the proceedings against them comply with the [Nevada] Statute." 10 F.3d at 637. The NCAA objected to the law under the Commerce Clause, and this Court agreed. The challenged law "would force the NCAA to regulate the integrity of its product in every state according to Nevada's procedural rules," and would govern a disciplinary hearing even if the hearing were to occur "wholly outside Nevada's borders." *Id.* at 639. As this Court explained, "[t]hat sort of extraterritorial effect is forbidden by the Commerce Clause." *Id.*[2]

Like the statute in *NCAA*, the CRRA explicitly regulates transactions (art sales) that occur outside the legislating state. As explained above, the out-of-state sales provision has effect *only* where the sale takes place in another state. Indeed, its explicit purpose was to reach out-of-state sales because the Legislature

---

[2] Due to constitutional concerns, courts apply a strong presumption against extraterritoriality when construing legislation. *See, e.g.*, *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007) (construing South Carolina statute not to operate beyond state's borders because "[t]he principle that state laws may not generally operate extraterritorially is one of constitutional magnitude"); *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 468 (9th Cir. 2001) (construing city ordinance to limit its extraterritorial effect to adopt the "interpretation that most clearly supports constitutionality"). The California Supreme Court has applied the "presumption against extraterritorial legislation" in holding that the UCL does not apply to conduct outside the state. *Sullivan v. Oracle Corp.*, 51 Cal.4th 1191, 1207 (2011). This means that Plaintiffs' out-of-state UCL claims are invalid under the statute, regardless whether they also violate the Commerce Clause.

recognized that confining the law's scope to California would harm the domestic art market. *See infra* pp. 54-58.

Plaintiffs do not (and cannot) dispute that they have asserted claims based on auction sales that occurred wholly out-of-state, as all elements of the auction sales occurred outside California.[3] Auctions are governed by Uniform Commercial Code ("UCC") §2-328. *See* N.Y. U.C.C. §2-328; Cal. Com. Code §2328. Under the UCC, "the potential purchaser's bid is the equivalent of an offer to buy the merchandise. This offer is accepted by the auctioneer upon the fall of the

---

[3] Amici California Lawyers for the Arts et al. ("CLA") argue that the Auction Houses brought a facial challenge to the out-of-state sales provision of the CRRA and that factual development is needed to determine if that provision could be constitutionally applied to some out-of-state sales. CLA Br. at 14-24. This argument is incorrect. The Auction Houses did not bring a facial challenge, but rather asserted a Commerce Clause defense as to a limited subset of the CRRA's applications—namely, its application to out-of-state sales. *See Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) ("A paradigmatic as-applied attack . . . challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance"). Moreover, while Plaintiffs argued below that the Auction Houses had asserted a facial challenge, Plaintiffs have waived that issue on appeal, and it cannot be raised by amici. *E.g., Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) (issue raised by amicus but not by appellant "is not before us"); *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 861-62 (9th Cir. 1982) (similar). Plaintiffs admit that the claims at issue are based on "out-of-state transactions," and they do not argue that any factual development is required to assess those claims. Plaintiffs' Br. at 34. The Court should therefore disregard CLA's arguments: "[A]n appellant and an *amicus* may not split up the issues and expect the court to consider that they have all been raised on appeal. It is the appellant's case, not a joint appeal by the appellant and the *amicus*." *Amoco Oil Co. v. United States*, 234 F.3d 1374, 1378 (Fed. Cir. 2000).

hammer." *Commodities Recovery Corp. v. United States*, 34 Fed. Cl. 282, 289 (1995) (citing UCC §2-328). At that point, "[a] contract [is] formed as a matter of law," *Cedyco Corp. v. Petroquest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007), and the "sale by auction is complete." *Hessel v. Christie's Inc.*, 399 F.Supp.2d 506, 517 (S.D.N.Y. 2005). As to out-of-state auctions, the CRRA thus seeks to govern conduct "wholly outside [California's] borders" and accordingly "violates the commerce clause per se, and [the Court] must strike it down without further inquiry." *NCAA*, 10 F.3d at 638-39.[4]

Plaintiffs resist this conclusion with a string of unpersuasive, legally untenable arguments.

---

[4] CLA argues that the CRRA may be applicable to some out-of-state sales, depending on the terms of the agreement between the California seller and his or her agent. CLA Br. at 18. A similar argument was rejected by the District Court because such agreements are not part of the conduct regulated by the CRRA: "[T]he CRRA does *not* purport to regulate any potential agreement between a seller and the seller's agent; rather, it solely regulates the actual sale." ER20 n.5 (emphasis in original). Plaintiffs have not disputed this aspect of the District Court's ruling, and CLA cannot do so on its own. *See supra* n.3. The District Court ruling, moreover, was correct. In applying the Commerce Clause, courts look to the location of the regulated conduct, not to events before or after. *E.g.*, *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 669 (7th Cir. 2010) (Indiana could not regulate loans made in Illinois even though the lender advertised in Indiana and the collateral was located there); *Dean Foods Co. v. Brancel*, 187 F.3d 609, 617-19 (7th Cir. 1999) (considering only "where the sales . . . actually took place" and not preliminary solicitations and agreements).

*First*, Plaintiffs emphasize that the CRRA's *other* provision—the in-state sales provision—"expressly applies to instances in which the 'sale takes place in California.'" Plaintiffs' Br. at 39 (quoting Cal. Civ. Code §986(a)). True enough, just as the Nevada statute in *NCAA* applied to disciplinary hearings in Nevada. But a regulation's in-state applicability does not change the fact that it may also apply "wholly outside [the legislating state's] borders," which renders it invalid as to that extraterritorial application. *NCAA*, 10 F.3d at 639. Otherwise, any state could govern conduct outside its borders simply by regulating in-state conduct on equal terms. "But as the case law has long recognized, the commerce clause can be violated even when there is no outright discrimination in favor of local business." *Midwest Title*, 593 F.3d at 665; *see NCAA*, 10 F.3d at 638 ("error" to think that a law does not directly regulate interstate commerce merely because law evenhandedly regulates both in-state and out-of-state behavior). The CRRA's out-of-state sales provision applies to sales wholly outside California, even if the in-state sales provision does not; that fact is sufficient to give the out-of-state provision an impermissible extraterritorial scope.

*Second*, Plaintiffs stress that "for sales that do not take place in California, the Act applies only if the 'seller resides in California.'" Plaintiffs' Br. at 40. But the participation of a California seller does not bring an out-of-state sale within

California's borders or within its regulatory authority. Indeed, courts have consistently held that states cannot regulate their residents' out-of-state conduct.[5]

A contrary rule would permit California—or any state—to govern from afar the out-of-state conduct of its residents. Courts thus have rejected laws regulating extraterritorial conduct, even when the legislating state's residents were involved. *See Midwest Title Loans*, 593 F.3d at 669 (invalidating Indiana consumer law governing out-of-state loans to Indiana residents because "[t]he contract was, in short, made and executed in Illinois, and that is enough to show that the [law] violates the commerce clause");[6] *NCAA*, 10 F.3d at 640 (enjoining Nevada law on

---

[5] *E.g.*, *Healy*, 491 U.S. at 337-41 (Connecticut could not regulate out-of-state sales by Connecticut brewers); *Bigelow v. Virginia*, 421 U.S. 809, 824 (1975) (Virginia could not "prevent its residents from traveling to New York to obtain services or . . . prosecute them for going there"); *Baldwin*, 294 U.S. at 518-22 (New York could not regulate prices New York dealer paid for out-of-state purchases); *Dean*, 187 F.3d at 619-20 (Wisconsin could not regulate out-of-state sales by Wisconsin farmers because, "as the legal rules we apply here make clear, the fact that a particular transaction may affect or impact a state does not license that state to regulate commerce which occurs outside its jurisdiction").

[6] Plaintiffs argued below that, unlike the law in *Midwest Title*, the CRRA imposes a legal duty only on sellers who have a "nexus" to California by virtue of their residency. ER465-66. But the Supreme Court's "direct regulation" test depends on the location of the regulated *conduct*. Where, as here, that conduct involves a contractual sale, the issue is whether "[t]he contract was . . . made and executed" in the legislating state, *Midwest Title*, 593 F.3d at 669, not whether one of the contracting parties resides in the legislating state. Indeed, the case for extraterritorial regulation is even weaker here than in *Midwest Title*: The statute there could at least be defended as an attempt by Indiana to "protect[] its residents" from predatory lenders. *Id.* at 663. The CRRA, by contrast, cannot be defended as

*(cont'd)*

Commerce Clause grounds in suit involving Nevada residents). Nor may a state redefine an out-of-state transaction as in-state based on the participation of its residents. *See, e.g.*, *Carolina Trucks & Equip., Inc.*, 492 F.3d at 491 (rejecting South Carolina's regulation of out-of-state sales of vehicles to in-state residents because "a plaintiff cannot seek to apply one state's statute to transactions in another state through an expansive definition of the site of the regulated conduct"); *Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 70 (2d Cir. 2012) ("a party's residency or citizenship is irrelevant to the location of a given transaction").

***Third***, Plaintiffs urge that an auction house will be held liable under the CRRA only when it "act[s] as 'agent' for the California seller" and "its acts are legally attributable to the California seller." Plaintiffs' Br. at 29, 40. But the auction house's only relevant "act" is its sale of a piece of art *outside* California's borders. Just as the California residency of the seller does not give the State regulatory authority over that out-of-state sale, neither does the auction house's agency relationship with that seller. *See* Restatement (First) of Conflict of Laws

---

*(cont'd from previous page)*

a special protection for California artists because it applies to all artists. *See Edgar*, 457 U.S. at 644 ("While protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders.").

§330 ("If one authorizes a person to accept for him an offer made by a third party, the place of contracting is *where the second person in pursuance of such authority accepts the offer*."). Indeed, the auction house's connection to California is even more tenuous than the seller's.

In a footnote, Plaintiffs suggest that when the Auction Houses "elect[ed] to act as agents for California sellers," they "affirmatively chose to subject themselves to California's regulation of California transactions and sales by California residents." Plaintiffs' Br. at 40 n.10. Factually, this is false, for an out-of-state auction house has no reason to assume it will be subject to California's laws for a transaction occurring wholly outside that state. *See,* e.g., *Doss, Inc. v. Christie's, Inc.*, 2009 WL 3053713, at *1 & n.2 (S.D.N.Y. Sept. 23, 2009) (New York auctions are governed by New York law). Moreover, this argument is just a reformulation of Plaintiffs' erroneous argument that California may regulate out-of-state conduct as long as one of its residents is involved. The fact that an auction house has formed an agency relationship with a California resident does not permit California to regulate sales with third parties that take place in another state.

The cases relied upon by Plaintiffs are not to the contrary. In *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219 (9th Cir. 2003), a California corporation (Gravquick) formed a contract with a Danish corporation (Trimble) for the distribution of products in Denmark. By its terms, the contract was intended to

"be governed and construed under the laws of the State of California." *Id.* at 1221.

When Trimble terminated the contract, Gravquick invoked a California law

requiring 90 days' written notice and a showing of good cause. Trimble argued

that California law could not be applied to their dispute under the dormant

Commerce Clause. The Court disagreed because (i) the California contract-

termination law "only applies to this case because the parties *chose* to be governed

by California law" and (ii) the parties' contract was performed partly in California.

*Id.* at 1224 (holding that regulation of commerce that occurs "entirely outside of

the state" is prohibited). In the present case, by contrast, the Auction Houses

certainly have not agreed that the CRRA will govern their obligations with respect

to out-of-state sales to third parties, and the sales at issue occurred entirely outside

of California.[7]

Nor is Plaintiffs' argument salvaged by *S.D. Myers, Inc. v. City & County of

San Francisco*, 253 F.3d 461 (9th Cir. 2001). There, a San Francisco ordinance

required that "contractors with the city provide nondiscriminatory benefits to

employees with registered domestic partners." *Id.* at 465. Limiting the ordinance

---

[7] The CLA Brief (at 21-22) also relies on decisions that upheld state laws
because the regulated conduct occurred partly in the regulating state. *E.g.*, *Quik
Payday, Inc. v. Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008) (Kansas statute applied
to loans made to "Kansas consumers *while they are in Kansas*") (emphasis in
original). Here, it is undisputed that the auction sales at issue occurred entirely
out-of-state.

to employees working on a city contract, this Court emphasized that the ordinance "contain[ed] no language . . . targeting either out-of-state entities or entities engaged in interstate commerce." *Id.* at 468. The Court also stressed that the ordinance applied "only after [the contractor] has affirmatively chosen to subject itself to the Ordinance by contracting with the City," and that it was "significant to our 'direct regulation' inquiry that the City imposes the Ordinance through contract rather than by legislative fiat." *Id.* at 469. In contrast, the CRRA's out-of-state sales provision explicitly "target[s] . . . entities engaged in interstate commerce"— entities who sell art outside the State's borders. It also is a "legislative fiat" regulating art sales between private parties as a matter of regulatory command, not "affirmative cho[ice]." *Id.* Much as Plaintiffs might urge otherwise, the decision to sell art on behalf of a California resident is not analogous to signing a contract with the State that expressly provides for the application of California law.

**Fourth**, Plaintiffs assert that "if defendants do what the Act requires, the economic impact of the 5% levy will fall solely on the California seller." Plaintiffs' Br. at 41. This is both incorrect and irrelevant. It is incorrect because the costs of regulatory compliance—including ascertaining the CRRA's applicability, locating the artist, and paying the 5% royalty—most likely will fall on both the seller and the Auction Houses. It is irrelevant because, even if the California seller paid every penny, that would not change the CRRA's

23

extraterritorial effect, as Plaintiffs' own authority shows. In *Valley Bank of Nevada v. Plus Sys., Inc.*, 914 F.2d 1186 (9th Cir. 1990), Nevada passed a law permitting Nevada banks to charge a "transaction fee" for ATM withdrawals made within the state by non-bank customers. A company running an interstate network challenged the law on Commerce Clause grounds because Nevada was "dictat[ing] terms governing [an] out-of-state transaction." *Id.* at 1191. This Court disagreed, explaining that the relevant transaction occurred in Nevada, even if the cardholder was from another state. *Id.* The transaction occurred *in Nevada* because that is where the ATM was used—regardless of whether the ATM customer hailed from out-of-state or paid the transaction fee from an out-of-state account. What mattered was the location of the ATM transaction itself. The same principle applies here: The relevant transaction occurs outside California because that is where the art is sold, even if some or all of the costs of compliance are ultimately borne by a California resident.[8] *Midwest Title Loans*, 593 F.3d at 669 ("The

---

[8] Plaintiffs analogize the role of an auction house in withholding CRRA royalties to that of the out-of-state bank that forwarded the ATM fee in *Valley Bank*. Plaintiffs' Br. at 46. That analogy is flawed. The Commerce Clause issue turns on the location of the regulated conduct. *Valley Bank* held that Nevada could regulate *in-state* ATM withdrawals—even when the ATM fees were paid from out-of-state bank accounts of non-Nevada customers—because the regulated conduct was what the customer did "while at the ATM *in Nevada*." 914 F.2d at 1191 (emphasis in original). In this case, by contrast, the regulated conduct is the auction sale that takes place *outside* California.

consequences of a commercial transaction can be felt anywhere. But that does not permit New York City to forbid New Yorkers to eat in cities in other states that do not ban trans fats from their restaurants."); *see also Edgar*, 457 U.S. at 642-43 ("The Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.").

*Fifth*, Plaintiffs state that "for the Act to apply to an out-of-state auction house, the auction house must have a presence in California." Plaintiffs' Br. at 41. This supposed "presence" requirement is invented out of whole cloth by Plaintiffs, based on their misguided attempt to import a line of cases that governs use taxes. *See infra* pp. 35-53 (discussing the inapplicability of the tax cases). The statute does not mention "a presence in California," much less require an auction house to have one. But even if it did, that would be irrelevant: An auction house's conduct within California gives the State regulatory power only over *that* conduct; it does not give California "power to project its legislation into" another state and control what happens there. *Baldwin*, 294 U.S. at 521. Otherwise, California could control the out-of-state behavior of any company with a nationwide presence—for instance, forcing McDonald's franchises in New York to follow California's health code, merely because the company also sells hamburgers in California. No state's

legislative authority over "local needs" stretches so far.  *Great Atl. & Pac. Tea*, 424 U.S. at 371.

**B.** **The Practical Effect Of The CRRA Is To Control Commerce Beyond California's Borders.**

The out-of-state sales provision is also invalid under settled law because the "practical effect of the regulation is to control conduct beyond the boundaries of the State."  *Healy*, 491 U.S. at 336.

In *Brown-Forman*, New York "regulate[d] the sale and distribution of alcoholic beverages within its borders" by requiring state-certified distillers to affirm that they would not charge a higher price to New York wholesalers than to out-of-state wholesalers.  476 U.S. at 575-76.  Although recognizing New York's legitimate interest in "seek[ing] low prices for its residents," *id.* at 582, the Supreme Court nonetheless struck the law down based on its impact on out-of-state liquor prices:  "That the ABC Law is addressed only to sales of liquor in New York is irrelevant if the 'practical effect' of the law is to control liquor prices in other States."  *Id.* at 583; *see also Healy*, 491 U.S. at 337-40 (invalidating Connecticut law requiring out-of-state beer shippers to affirm that posted prices for products sold to Connecticut wholesalers were not higher than prices in neighboring states, since the law had the practical effect of regulating prices in other states).

26

In the present case, the practical effect of the CRRA is not only to require royalty payments based on out-of-state auctions, but also to mandate that auction houses that sell art in other states must comply with a series of regulatory requirements, all of which involve conduct outside California:

- The auction house must determine whether the seller is a California resident. Cal. Civ. Code §986(a). This must be done for *all* out-of-state art sales, even where the seller turns out not to reside in California.

- The auction house must determine how much the seller originally paid to obtain the art in order to determine whether the original purchase price exceeds the "gross sales price" of the resale. *Id.* §986(b)(4).

- The auction house must identify the artist and determine whether "at the time of resale, [he or she] is a citizen of the United States, or a resident of [California] who has resided in the state for a minimum of two years." *Id.* §986(c)(1).

- The auction house must withhold payment of 5% of the gross sale proceeds.

- The auction house must attempt to "locate the artist"—who may be anywhere in the country, or even the world—and arrange payment, if possible. *Id.* §986(a)(1).

- If the artist is deceased, the auction house must determine the date of the artist's death and identify "his or her heirs, legatees, or personal representative" for up to 20 years after the artist's death. *Id.* §986(a)(7).

- If the artist cannot be found within 90 days, the auction house must pay the withheld 5% of the gross sale proceeds to the California Arts Council. *Id.* §986(a)(2).

These are classic regulatory requirements, imposed on conduct beyond the borders of California, which constitute "practical effect"; they are legal commands,

and the failure to comply with them results in civil liability. *See* Cal. Civ. Code §986(a)(3); *see generally Healy*, 491 U.S. at 336.

In response, Plaintiffs offer two arguments, neither of which is persuasive. First, Plaintiffs assert that, unlike the liquor laws in *Healy* and *Brown-Forman*, the CRRA "has zero effect on the prices charged for art in other states." Plaintiffs' Br. at 43. Plaintiffs offer no support for this purported fact, which basic economic principles belie. Regardless, even if, contrary to logic, the price were unaffected, Plaintiffs offer no authority for the erroneous proposition that the "practical effects" test is limited to *price* effects. To the contrary, "[a]lthough cases like *Healy* and *Brown-Forman Distillers Corp.* involved price affirmation statutes, the principles set forth in these decisions are not limited to that context." *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 659 (7th Cir. 1995). The "practical effect" test plainly applies to regulatory effects as well. *See, e.g.*, *S. Pac. Co. v. Arizona*, 325 U.S. 761, 775 (1945) (invalidating Arizona law regulating the length of trains operating within the state because the "practical effect of such regulation is to control [conduct] beyond the boundaries of the state"); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102-04 (2d Cir. 2003) (striking down, under the Commerce Clause, a Vermont law regulating distribution of sexual material harmful to minors due to the law's "practical effect" on activity beyond the state's borders); *Nat'l Solid Wastes Mgmt. Ass'n*, 63 F.3d at 658 (striking down

Wisconsin law subjecting out-of-state waste generators to recycling requirements due to "[t]he practical impact of the Wisconsin statute on economic activity completely outside the State"). As these cases show, a state may not use its regulatory authority to control out-of-state transactions, regardless whether the regulation focuses on the transaction's price or on some other feature.[9]

Second, Plaintiffs note that "[t]he agent can escape any liability by doing what the Act directs." Plaintiffs' Br. at 43. This tautology proves nothing. A state cannot claim that its laws have no practical outside-the-state effect because an outside-the-state actor who complies with them will not be penalized.

Further demonstrating the CRRA's out-of-state consequences, the Act interferes with other states' "actual and imminent" legislative judgments. *S.D. Myers, Inc.*, 253 F.3d at 469-70. At least fifteen states have explicitly considered, *and declined to adopt*, resale royalty legislation. *See* ER1387-90, ER1410, ER1516, ER1600, ER1604, ER1637, ER1640. For instance, in 1977, New York considered a bill—nearly identical to the then-recently enacted CRRA—that would

---

[9] Although Plaintiffs' statement that there is no price effect would not carry the day even if correct, the assumption is obviously flawed. A seller must demand a higher sale price in order to keep an art resale at the same level of profitability despite the 5% royalty; if the price is not high enough to absorb the 5% royalty, moreover, the sale will be unprofitable and may not occur. In the case of an auction, the seller may set a higher reserve price to ensure the sale is profitable despite the royalty. In that situation, the effect of the CRRA will be to prevent any sale from taking place at a price that falls below the new, higher reserve price.

have created a resale royalty on profitable art sales at a price of more than $1,000. ER1282. Like the CRRA, the New York bill would have "applie[d] to any sale occurring in the State of New York or to any sale anywhere by a New York 'resident.'" *Id*. But the bill was defeated after "a number of potentially serious legal questions" were identified, including the potential for conflict with the CRRA:

> One principal area of legal difficulty involves the bill's territorial application. The Committee believes that a serious constitutional conflict is raised by the regulation of sales by New York "residents" (a term which unfortunately is not defined) in other states. This problem is further compounded if the sale by a New York "resident" takes place in a jurisdiction which also has its own statute providing for payment to the artist on sales which are made in that jurisdiction. The application of the laws of both jurisdictions would result in two payments to the artist from the proceeds of the sale, with obvious implications for the viability of the entire transaction.

*Id*. New York thus recognized that its own attempt to regulate sales beyond its borders would create constitutional problems based in part on the regulation's "potential interaction or conflict with similar statutes in other jurisdictions." *NCAA*, 10 F.3d at 639.[10]

---

[10] The New York Legislature has considered and rejected a resale royalty at least eleven times, most recently in 2010. ER1269, ER1271-72, ER1285-90, ER1325-29, ER1336-38, ER1341-43, ER1346-51, ER1354-56, ER1359-61, ER1364-66, ER1369-71, ER1374-76, ER1379-81.

These repeated "attempts at legislation" in New York and other states establish that the absence of other resale royalty statutes is "not wholly inadvertent." *Bricker v. Rockwell Int'l Corp.*, 22 F.3d 871, 875 (9th Cir. 1993). Rather, other states believe that the art market should continue to operate based on traditional contract principles, free from regulatory fiat. *See Midwest Title,* 593 F.3d at 667 ("[T]he absence of an Illinois counterpart to the Indiana law makes clear [that Illinois] thinks [loan transactions] shouldn't be restricted in the way that Indiana thinks they should be."). "To allow [California] to apply its law" in any of the states that have rejected resale-royalty legislation "would be arbitrarily to exalt the public policy of one state over that of another." *Id.* at 667-68. That is precisely what the Commerce Clause prevents.

## II.  THE CRRA CANNOT BE UPHELD AS A TAX LAW

Apparently recognizing that out-of-state CRRA claims are invalid under well-settled law regarding state regulatory statutes, Plaintiffs have fashioned an entirely new argument on appeal:  that the CRRA imposes a "levy" comparable to a use tax.  Based on this tax analogy, Plaintiffs argue that the Auction Houses' California "nexus" is sufficient to require them to collect CRRA royalties for out-of-state sales.

Because this new tax argument was not raised below, it should not be considered on appeal.  The argument is also wrong.  The CRRA is not a tax law

31

and, even if it were, it could not constitutionally be applied to out-of-state transactions. Because California cannot govern out-of-state sales, it also cannot require the Auction Houses to collect royalties for such sales, even if the Auction Houses have a nexus with California.

### A.     <u>Plaintiffs Waived Their New Tax Argument.</u>

Plaintiffs' tax argument was not raised in the District Court or considered by Judge Nguyen. Although Plaintiffs argued below that the CRRA does not violate the Commerce Clause, their new tax argument involves a different theory that is not properly before this Court. *E.g.*, *Schmidt v. Burlington N. & Santa Fe Ry. Co.*, 605 F.3d 686, 689 (9th Cir. 2010) (alternative argument not raised in the district court was waived); *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1146 (9th Cir. 2008) (issues not presented to district court cannot be heard on appeal).

For instance, Plaintiffs rely heavily on Supreme Court tax cases such as *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977), and *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992). Yet Plaintiffs never cited *Complete Auto* below in opposing the motion to dismiss, *see* ER450 (table of cases), and they cited *Quill* only once—for the uncontroversial proposition that the "Commerce Clause 'prohibits discrimination against interstate commerce,'" ER464 (quoting *Quill*, 504 U.S. at 312) (emphasis omitted). Plaintiffs' new argument thus cannot

be considered on appeal: "Although there is no bright line rule to determine whether a matter has been raised below, 'a workable standard . . . is that the argument must be raised sufficiently for the trial court to rule on it.'" *Arizona v. Components Inc.*, 66 F.3d 213, 217 (9th Cir. 1995).

### B.  The CRRA Is Not A Tax Law.

The premise of Plaintiffs' new argument is that the CRRA is a tax law or equivalent to a tax law and, as such, can be upheld under case law concerning state use taxes.[11]  But the CRRA is not a tax law, and the case law Plaintiffs cite is inapplicable.

The "essential feature of any tax" is that "it produces some revenue for the Government."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S.Ct. 2566, 2594 (2012); *accord United States v. Butler*, 297 U.S. 1, 61 (1936) ("A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the government."); *In re George*, 361 F.3d 1157, 1160 (9th Cir. 2004) (a "tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government").

---

[11]  Plaintiffs incorrectly describe two of the Supreme Court decisions they rely on as sales tax cases.  Plaintiffs' Br. at 23 (discussing *Felt* and *Nelson*).  Both cases involved only use taxes.  *Nelson v. Sears Roebuck & Co.*, 312 U.S. 359, 360 (1941) ("[t]his case involves the constitutionality of the Iowa Use Tax"); *Felt & Tarrant Mfg. Co. v. Gallagher*, 306 U.S. 62, 64 (1939) ("Appellant seeks an injunction prohibiting [enforcement of] the California Use Tax Act of 1935.").

Plainly, the CRRA is not a tax law. It produces no government revenue. Rather, as Plaintiffs admitted below, the CRRA mandates payments "to private parties," not "to any government or governmental agency."[12] ER481-82. As the Supreme Court has explained, "The word [tax] has never been thought to connote the expropriation of money from one group for the benefit of another." *Butler*, 297 U.S. at 61.

The CRRA's legislative history also confirms its non-tax status. An early version of the Act would have given enforcement responsibility to the California State Board of Equalization ("SBE"), the State's collector of sales and use taxes. ER562-63, 573, 701-02, 708-09, 718-19. The SBE objected that its "tax collecting authority [was] not applicable" to the CRRA because "*it is inappropriate to mix the enforcement of private rights with the administration of the tax laws.*" ER719, 741.[13] As the SBE recognized, the CRRA is a classic regulatory measure, to which

---

[12] The CRRA provides that, if a seller or agent cannot find the artist, the payment must be made to the California Arts Council, which then tries to locate the artist. Cal. Civ. Code §§986(a)(2) & (5). If the Council also cannot find the artist, "the right of the artist terminates" after seven years and the money is then transferred to the Council. *Id*. §986(a)(5). That transfer does not make the CRRA a tax on the seller. It is instead an escheat of the artist's unclaimed property to the state. *See Taylor v. Westly*, 402 F.3d 924, 926 (9th Cir. 2005) (discussing escheat).

[13] The SBE formally opposed the bill, stating that "it is our belief that it would be unwise to assign [the CRRA's] administration and enforcement to a state tax agency" because "*[t]he program is more appropriately dealt with either by private contract or by some other means in the private sector.*" ER741-42; *see also*

(cont'd)

34

the Supreme Court's tax precedents do not apply. *See* Dan. T. Coenen,
Constitutional Law: The Commerce Clause 222 (2004) (the Supreme Court has
created "a specialized approach for applying the dormancy doctrine to state tax
laws, as opposed to state regulatory measures"); Erwin Chemerinsky,
Constitutional Law: Principles & Policies §5.4.1, at 466 (4th ed. 2011) ("[T]he
topic of state taxation of interstate commerce requires separate consideration
because the Court, both historically and currently, has formulated distinct tests for
evaluating state taxes that burden interstate commerce.").

### C. **Plaintiffs' Tax Theories Are Wrong.**

Based on their mistaken tax analogy, Plaintiffs argue that two theories
support their CRRA claims: (1) under the use tax case law, states can require a
third party to collect funds from out-of-state transactions if that party has a nexus
to the taxing state (Plaintiffs' Br. at 18-27); and (2) their out-of-state claims are
valid under the four-part test adopted in *Complete Auto Transit, Inc. v. Brady*, 430
U.S. 274 (1977). Plaintiffs' Br. at 27-38. Plaintiffs' arguments would be wrong
even if the CRRA were a tax (which it is not), since (1) states cannot tax out-of-

---

*(cont'd from previous page)*

ER719 ("The Board has raised the question of whether it is an appropriate function
of a state taxing agency to administer a program of this nature."). Any mention of
the SBE was subsequently eliminated from the proposed statute. *See* ER744-46.

state sales; (2) states cannot require third parties to collect invalid taxes even if they have a nexus with the taxing state; and (3) the CRRA fails at least three parts of the *Complete Auto* test.

### 1. States Cannot Tax Out-Of-State Transactions.

In considering state taxes, the Supreme Court has instructed that courts must identify the "operating incidence of the tax," *i.e.*, the "taxable event" defined by state law. *Colonial Pipeline Co. v. Traigle*, 421 U.S. 100, 109 (1975). The "limits of the state's legislative jurisdiction to tax . . . are to be ascertained by reference to the incidence of the tax upon its objects." *Conn. Gen. Life Ins. Co. v. Johnson*, 303 U.S. 77, 80 (1938). Here, as Plaintiffs admit, the "taxable event" at issue is an "art sale" which "occurs in another state." Plaintiffs' Br. at 27.

Just as the Commerce Clause prohibits state regulation of out-of-state conduct, state taxes are also prohibited if the taxable event occurs outside the state. *Memphis Nat'l Gas Co. v. Stone*, 335 U.S. 80, 95 (1948) ("[A] prohibited tax exaction is one beyond the power of the state because the taxable event is outside its boundaries."). A state thus cannot tax out-of-state property. "The taxation of property not located in the taxing State is constitutionally invalid, both because it imposes an illegitimate restraint on interstate commerce and because it denies to the taxpayer the process that is his due." *Norfolk & W. Ry. Co. v. Mo. State Tax Comm'n*, 390 U.S. 317, 325 (1968); *accord Great Atl. & Pac. Tea Co. v. Grosjean*,

301 U.S. 412, 424 (1937) ("The state may not tax real property or tangible personal property lying outside her borders.").

Likewise, states cannot tax out-of-state sales or contracts. In *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995), the Court held that Oklahoma was the only state permitted to tax the sale of a ticket for an interstate bus trip because the ticket sale was a discrete event that was "consummated" entirely in Oklahoma. *Id.* at 186-88. Numerous decisions apply the same rule in sales and contract cases.[14]

In addition, as Plaintiffs admit (Plaintiffs' Br. at 37), a tax must be "fairly related to the services provided by the State." *Complete Auto Transit*, 430 U.S. at

---

[14] *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 9 (1986) (fuel sale was "discrete transaction" that could be taxed only in the jurisdiction where it took place); *Am. Oil Co. v. Neill*, 380 U.S. 451, 457-59 (1965) (Idaho could not tax Utah fuel sale); *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 345-46 (1954) ("Maryland could not have reached this Delaware vendor with a sales tax on these [Delaware] sales"); *Norton Co. v. Dept. of Revenue of Ill.*, 340 U.S. 534, 537, 539 (1951) (Illinois could not tax out-of-state sales); *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330 (1944) ("For Arkansas to impose a tax on [Tennessee sales] transactions would be to project its powers beyond its boundaries and to tax an interstate transaction."); *Conn. Gen.*, 303 U.S. at 80-82 (California could not tax Connecticut insurance contracts); *Compania Gen. de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 94-95 (1927) (a state "may not compel any one within its jurisdiction to pay tribute to it for contracts or money paid to secure the benefit of contracts made and to be performed outside of the state"); *Shell Oil Co. v. State Bd. of Equalization*, 64 Cal.2d 713, 725 (1966) (no other state could tax sales "consummated in California, without violating the commerce and due process clauses of the Constitution").

279.  One reason states cannot tax out-of-state transactions or property is because those taxes are not related to any services provided by the taxing state.  Since a resident's out-of-state property is "wholly within the taxing power of another state . . . the taxation of such property within the domicile [state] of the owner partakes rather of the nature of an extortion than a tax, and has been repeatedly held by this court to be beyond the power of the legislature."  *Union Refrigerator Transit Co. v. Kentucky*, 199 U.S. 194, 201 (1905).

Plaintiffs offer no authority for the proposition that a state can tax out-of-state transactions.  Plaintiffs instead analogize the CRRA to a use tax, in which a state taxes property that is bought elsewhere but brought into and used within the taxing state.  In so doing, they mischaracterize use taxes as "a financial burden imposed by one state on a transaction that occurs in another state."  Plaintiffs' Br. at 27.  The taxable event for use tax purposes is not the out-of-state sale, but rather the use of the sold property in the taxing state.  *McLeod*, 322 U.S. at 330 ("A sale tax and a use tax . . . are assessments upon different transactions . . . .  A sales tax is a tax on the freedom of purchase. . . .  A use tax is a tax on the enjoyment [in the taxing state] of that which was purchased.");  *Henneford v. Silas Mason Co.*, 300

U.S. 577, 582 (1937) (a use tax "is not upon the operations of interstate commerce, but upon the privilege of use after commerce is at an end").[15]

Indeed, use taxes were developed precisely because states cannot constitutionally tax sales or transactions in other states:

> [A use tax is] intended to reach property purchased for use and storage in the taxing jurisdiction from retailers who, being outside such jurisdiction, are not subject to its laws. It also seeks to reach such property where the taxable event of a sales tax, i.e., the sale, occurs outside of this state or where such property is immune from the sales tax because of the commerce clause.

*Rivera v. Fresno*, 6 Cal.3d 132, 138 (1971).

States often compel out-of-state sellers to collect use taxes on items purchased out-of-state but brought into and used within the taxing state. In those instances, the tax is collected by the merchant at the time of the sale because "the impracticability of its collection from the multitude of individual purchasers is obvious." *Nat'l Geographic Soc'y v. Cal. Bd. of Equalization*, 430 U.S. 551, 555

---

[15] Plaintiffs similarly misstate that *Quill* concerned a requirement "to collect levies (like use taxes) owed under state law on transactions occurring outside the levy-imposing state." Plaintiffs' Br. at 18-19. *Quill* actually involved a North Dakota "use tax upon property purchased for storage, use or consumption *within the State*." 504 U.S. at 302. Plaintiffs also mischaracterize "a tax on an interstate phone call" as based on "a transaction that occurs in another state." Plaintiffs' Br. at 27. The Supreme Court has held that a consumer's purchase of an interstate phone call can be taxed only by the states in which the transaction occurs (*i.e.*, where the call originates or terminates or is billed or paid). *Goldberg v. Sweet*, 488 U.S. 252, 263 (1989). Plaintiffs cite no decision in which a court upheld a state tax on any type of transaction or conduct that occurred wholly out-of-state.

(1977). But while an out-of-state sale may trigger the collection of a use tax, that "does not make the tax upon the use a tax upon the sale." *Henneford*, 300 U.S. at 587. Rather, the item's use in the taxing state "is what is taxed regardless of the time and place of passing title and regardless of the time the tax is required to be paid." *Nelson*, 312 U.S. at 363. An out-of-state seller thus does not have to collect a use tax if there is a "lack of certainty" that the buyer will use the sold item in the taxing state. *Nat'l Geographic*, 430 U.S. at 561-62; *accord Montgomery Ward & Co. v. State Bd. of Equalization*, 272 Cal.App.2d 728, 757 (1969) (out-of-state retailers did not have to collect California use tax on over-the-counter sales to California residents).

Furthermore, when state law defines the taxable event as a sale, the law cannot be applied to sales in other states on the theory that it has the same effect as a use tax. In *McLeod*, the Supreme Court held that the Arkansas sales tax law could not be applied to sales to Arkansas buyers in Tennessee. 322 U.S. at 329. The Court rejected the argument that the tax could be sustained as a use tax. *Id.* at 330 ("a tax on an interstate sale like the one before us and unlike a tax on the enjoyment of the goods sold, involves an assumption of power by a State which the Commerce Clause was meant to end").

Here, the CRRA is certainly not analogous to a use tax, since it is imposed on sellers based on sales only. Its applicability does not depend on the subsequent

use of the property by the buyer, who does not even have to be a California resident.[16]   Because California cannot impose a tax on sales in other states, Plaintiffs' out-of-state CRRA claims would be invalid even if the CRRA were a tax law.

### 2.   Plaintiffs' Nexus Argument Is Wrong.

Plaintiffs' primary argument is that California can require the Auction Houses to collect royalties for out-of-state sales merely because they have a sufficient nexus with the state.  Plaintiffs' Br. at 18-27.  Indeed, after asserting that a nexus exists, Plaintiffs argue that the Court "need not read further in order to determine that the judgments must be reversed." *Id.* at 27.

---

[16]   The CRRA cannot be recharacterized as a use tax on the theory asserted by amicus Artists Rights Society ("ARS")—but not by Plaintiffs—that "California has chosen to tax the owner of a good at the end of their use of the product, rather than at the beginning."  ARS Br. at 5.  The CRRA requires a royalty payment if "the seller resides in California," without regard to whether the sold art was ever used in California or was even physically present in the state.  Cal. Civ. Code §986(a).  In contrast, California's actual use tax is based "on the storage, use or other consumption *in this state* of tangible personal property purchased from any retailer . . . for storage, use, or other consumption *in this state*."  Cal. Rev. & Tax. Code §6201.  Nor can the ARS equate the CRRA with "California's tax on residents for capital gains realized outside state borders, such as the sale of securities on exchanges located in New York."  ARS Br. at 3.  The taxable event for California's capital gains tax is not a sale of securities, but the receipt of net income by a state resident.  Cal. Rev. & Tax. Code §18151 (incorporating federal capital gains law).  A state may tax residents' income from out-of-state sales, but it cannot tax the sales themselves.  *N.Y. ex rel. Cohn v. Graves*, 300 U.S. 308, 313-14 (1937) (states "may tax net income from operations in interstate commerce, although a tax on the commerce itself is forbidden").

Contrary to Plaintiffs' stage directions, even if the CRRA were a tax law, its validity would not primarily depend on the collectors' nexus with the taxing state; the Court would first have to consider the validity of the underlying tax obligation. A state cannot require a third party to collect a tax that has not been validly imposed on the taxpayer, regardless of the third party's nexus with the taxing state. In other words, if the underlying tax is invalid—such that the taxpayer cannot be required to pay it—a third party also cannot be required to collect it. Here, because the CRRA payment obligation is invalid as to out-of-state sales, California cannot compel the Auction Houses to withhold money from such sales, nor can it impose liability on the Auction Houses for not doing so.

This simple rule—if no valid tax, then no collection duty—applies even if the seller would otherwise have a sufficient collection nexus with the taxing state. Plaintiffs ignore that rule. They rely, for example, on *National Geographic*, which held that, because the National Geographic Society had offices in California, the state could require it to collect use taxes based on its shipments of merchandise to buyers in California. Plaintiffs' Br. at 21-22. But Plaintiffs fail to mention that the *National Geographic* Court also held that a direct tax obligation—as opposed to a third-party collection obligation—is valid only if the tax is based on the taxpayer's activity in the taxing state. Thus, a "showing that particular transactions are dissociated from the [taxpayer's] local business [in the taxing state]" is "fatal to a

direct tax" on those transactions. 430 U.S. at 560 (citing decisions which held that states cannot impose taxes based on out-of-state activities merely because the taxpayer is a state resident or has "dissociated" business in the taxing state).

As *National Geographic* also explains, if a tax is invalid, an out-of-state seller cannot be required to collect the tax, even if the seller would otherwise have a sufficient collection nexus with the taxing state. *Id.* at 560-62. It was undisputed in *National Geographic* that California could impose valid use taxes on California residents who received merchandise that the Society shipped into the state. The Court therefore distinguished *Miller Brothers*, which held that a Delaware retailer did *not* have to collect Maryland use taxes for sales to Maryland residents. *Id.* at 561-62. Because the sales occurred at a Delaware store, and it was not certain the sold items would actually be used in Maryland, the sale did not give rise to a valid use tax as to the buyer. *Id.*

This "relational defect between the taxing State and the person or property sought to be taxed therefore obviated any relevance of a relationship between the State and the out-of-state retailer." *Id.* at 562. In other words, because Maryland could not validly impose a use tax on the Maryland buyers at the time of the sale, it also could not impose a collection duty on the Delaware retailer—regardless of the retailer's nexus with Maryland. *See Miller Bros.*, 347 U.S. at 346 ("It would be a strange law that would make appellant [i.e., the retailer] more vulnerable to

liability for another's tax than to a tax on itself."); *see also Nat'l Geographic Soc'y v. State Bd. of Equalization*, 16 Cal.3d 637, 649 (1976) ("unless the seller by his own actions makes certain the taxable use, e.g. by sending or delivering the merchandise into the taxing state, he cannot be required to collect the tax"), *aff'd*, 430 U.S. 551 (1977).

Likewise, the Supreme Court held in *McLeod* that Arkansas could not compel Tennessee retailers to collect invalid sales taxes from Arkansas buyers even though—as the dissenting opinion pointed out—the retailers solicited sales in Arkansas and therefore had a sufficient collection nexus with the taxing state. 322 U.S. at 332. Under Arkansas law, the tax was "required to be paid by the consumer, even though the seller may be required to collect and remit the tax." Brief of Petitioner, *McLeod v. J. E. Dilworth Co.*, 322 U.S. 349 (No. 311), 1944 WL 42800, at *5. As the retailer argued, because "the State could not impose and collect the tax, the effect is that the purchaser (against whom the tax is *imposed*) is not liable; hence the seller cannot be compelled to *collect*." Brief of Respondent, *McLeod v. J. E. Dilworth Co.*, 322. U.S. 349 (No. 311), 1944 WL 42801, at *3 (emphasis in original); *accord Bloomingdale Bros. v. Chu*, 70 N.Y.2d 218, 221-22 (1987) (citing *McLeod*, the court held that New York could not tax sales at the retailer's out-of-state stores, nor require the retailer to collect such taxes, even though the retailer had a New York nexus).

In contrast, in every use tax decision Plaintiffs cite, including *National Geographic* and *Quill*, it was undisputed that the use tax at issue could be validly imposed on the taxpayers, based on the sellers' shipments of merchandise into the taxing state. The only issue was whether the out-of-state seller's nexus with the taxing state was sufficient to require collection of those indisputably valid taxes. Plaintiffs' Br. at 18-25. Those decisions do not deal with the issue in this case: whether the CRRA is valid in the first place.

Since Plaintiffs have not shown (and cannot show) that the CRRA is valid, they argue instead that the Court need find only that the Auction Houses have a duty to collect. Plaintiffs' Br. at 27-31. Plaintiffs effectively argue that the Auction Houses were obligated to withhold royalties that the sellers could not legally be required to pay. That argument is plainly wrong.

### 3. Plaintiffs' *Complete Auto* Argument Is Wrong.

Plaintiffs also argue that their CRRA claims satisfy the *Complete Auto* test, which provides that a state tax is valid if it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." 430 U.S. at 279. *See* Plaintiffs' Br. at 27-38.

The Supreme Court has never applied *Complete Auto* to a non-tax regulation such as the CRRA. That is because the *Complete Auto* test is "a specialized

45

approach for applying the dormancy doctrine to state tax laws, as opposed to state regulatory measures." Coenen, Constitutional Law at 222. But even if the CRRA were a tax law, Plaintiffs' out-of-state claims would fail at least three parts of the four-part test.

(a)     **There Is No Substantial Nexus To California.**

Under the first prong of *Complete Auto*, a state tax is valid only if it "is applied to an activity with a substantial nexus with the taxing State." 430 U.S. at 279. Plaintiffs admit that the sales at issue are "auction sales by California sellers outside of California" (Plaintiffs' Br. at 28), but still argue that a sufficient nexus exists because the sellers are California residents and the Auction Houses act as the sellers' agent. *Id.* at 28-31.

*Complete Auto*'s first prong, however, concerns the nexus between the taxed "activity" and the "taxing state," rather than the state's nexus with a seller or seller's agent. *See* 430 U.S. at 279 (states may tax "an *activity* with a substantial nexus with the taxing State"). Plaintiffs offer no authority for the notion that a seller's residency permits a state to tax an out-of-state sale—for instance, that a Californian who opens a New York restaurant may be taxed by California on meals sold there. To the contrary, the rule is that, "in the case of a tax on an activity, there must be a connection to the activity itself, rather than a connection only to the actor the State seeks to tax." *Allied Signal, Inc. v. Director*, 504 U.S. 768, 778

46

(1992). Here, the "taxed" activity is out-of-state sales that have no California nexus.

Plaintiffs also remarkably contend that "[n]either the Supreme Court nor this Court (nor any court of which we are aware) has ever held (nor even remotely suggested) that a state cannot lawfully impose levies . . . on the transactions of its own residents." Plaintiffs' Br. at 45. Actually, the "settled rule [is] that a tax which is levied upon residents of the taxing state and imposes an undue burden on interstate commerce offends the commerce clause." *Woosley v. State*, 3 Cal.4th 758, 781 (1992). Thus, the U.S. Supreme Court "has, on numerous occasions, invalidated taxes imposed by states upon their own residents." *Id.* at 780 (citing decisions); *see also W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994) (assessment on Massachusetts dealers); *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641 (1994) (use tax on Missouri companies); *Williams v. Vermont*, 472 U.S. 14 (1985) (use tax on Vermont residents); *Cent. Greyhound Lines, Inc. of N.Y. v. Mealey*, 334 U.S. 653 (1948) (gross receipts tax on New York company); *McLeod*, 322 U.S. 80 (sales tax on Arkansas buyers).

### (b) <u>The CRRA Cannot Be Fairly Apportioned.</u>

The second prong of *Complete Auto* requires a tax to be "fairly apportioned." 430 U.S. at 279. A tax is fairly apportioned if it is both internally and externally consistent. Neither requirement is satisfied here.

Internal consistency does not exist if imposition of the same tax by other states would result in multiple taxation of the same event. *Okla. Tax Comm'n*, 514 U.S. at 184-85. Here, it is clear that multiple burdens would likely result if other states adopted similar resale royalty acts. For instance, if New York adopted a "NYRRA"—which applied whenever a sale takes place in New York or the seller resides in New York—then a California auction of art sold by a New Yorker would be subject to both states' laws, as would a New York auction of art sold by a Californian.

Plaintiffs argue that the CRRA does not create a risk of multiple burdens because "[i]f all states required payment of 5% to the artist, each state's 5% requirement would be satisfied with a *single* payment of 5%." Plaintiffs' Br. at 33 (emphasis in original). Plaintiffs' argument highlights the fact that the CRRA does not require payment to the government and therefore is not a tax law. But even ignoring that defect, multiple resale royalty laws could still result in multiple burdens. For instance, if the artist cannot be located, to whose "Arts Council" should the funds go? Or another state might decide that payment should be made to a private collecting society, rather than directly to artists.[17] In that instance, a

---

[17] *See* Stephanie B. Turner, *The Artist's Resale Royalty Right: Overcoming the Information Problem*, 19 UCLA Ent. L. Rev. 329, 359-61, 363-65 (2012) (proposed federal legislation would provide for a collecting society, as in European countries);

*(cont'd)*

California seller would be obligated to pay a CRRA royalty to the artist and a second royalty to the other state's collecting society—with both payments based on the same "taxable event."[18]

The CRRA also fails the external consistency test, which asks "whether a State's tax reaches beyond the portion of value that is fairly attributable to economic activity within the taxing State." *Okla. Tax Comm'n*, 514 U.S. at 185. Because the CRRA claims at issue are based on activity wholly outside California, they cannot possibly be "attributable to economic activity within [California]." Plaintiffs again rely on the seller's California residence and use of an agent. Plaintiffs' Br. at 34-35. But the activity to be taxed is a New York sales transaction, not any activity that occurs in California.

---

Shira Perlmutter, *Resale Royalties for Artists: An Analysis of the Register of Copyrights' Report*, 16 Colum.-VLA J.L. & Arts 395, 421 (1991-92) (proposing system in which "collection would be handled by a private collecting society").

[18] Although no other state currently has a resale royalty law, the internal consistency test requires consideration of possible state legislation. *Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 241-42 (1987). The ARS incorrectly argues that actual multiple "taxation" must be shown. (ARS Brief at 14.) The ARS relies on *General Motors Corp. v. Washington*, 377 U.S. 436, 449 (1964), which was expressly overruled in *Tyler Pipe*, 483 U.S. at 241-42, 248.

**(c)**     <u>The Royalty Is Not Related To State Services</u>.

The fourth *Complete Auto* prong asks whether the tax is "fairly related to the services provided by the State." 430 U.S. at 279. As already discussed, because the CRRA does not generate any government revenue, it cannot satisfy the requirement for a relationship between the royalties it mandates and services provided by the state. In addition, the burden it imposes on out-of-state sales is necessarily unrelated to services provided by the state. *See supra* pp. 36-41.

One of the reasons states cannot tax out-of-state sales is because they provide no benefits for such sales. *Okla. Tax Comm'n*, 514 U.S. at 186 ("[a] sale of goods is most readily viewed as a discrete event facilitated by the laws and amenities of the place of sale").[19] Here, Plaintiffs do not even try to argue that California sellers receive any services from California that facilitate out-of-state sales. That is fatal to their *Complete Auto* argument.

Plaintiffs instead argue that, because the Auction Houses receive benefits for separate California operations, California can require them to collect royalties based on out-of-state sales. Plaintiffs' Br. at 37-38. But because the sales are out-

---

[19]     *See Conn. Gen.*, 303 U.S. at 81 (California could not tax Connecticut activities because "[t]he performance of those acts was not dependent upon any privilege or authority granted by it, and California laws afforded to them no protection"); *Allied-Signal*, 504 U.S. at 778 ("We are guided by the basic principle that the State's power to tax an individual's or corporation's activities is justified by the 'protection, opportunities and benefits' the State confers on those activities.").

of-state, sellers receive no California benefits related to those sales and the "tax" is therefore invalid. *See supra* pp. 36-41. Moreover, any benefit the Auction Houses receive from California is unrelated to the out-of-state collection of royalties for artists. A state cannot compel foreign corporations like the Auction Houses to carry out a non-tax regulatory scheme in other states merely because they do business in the regulating state. Settled law provides that a "State may regulate the activities of foreign corporations within the State but it cannot regulate or interfere with what they do outside." *St. Louis Cotton Compress Co. v. Arkansas*, 260 U.S. 346, 349 (1922); *accord Conn. Gen.*, 303 U.S. at 80-81 (a state can tax "within its boundaries the property and activities of a foreign corporation licensed to do business there," but it cannot "tax or regulate the corporation's property and activities elsewhere").

### D. The CRRA Does Not Provide For A Valid Collection Duty.

Finally, even if Plaintiffs could surmount all of the hurdles discussed above (and they cannot), the CRRA would nevertheless be invalid because it is not limited to agents that have a California nexus.

Plaintiffs admit that a duty to collect valid taxes can be imposed only on a business with a nexus to the taxing state. Plaintiffs' Br. at 18-20. But the CRRA imposes a worldwide royalty-collection duty on any agent who sells art for a California resident, regardless of any nexus between the agent and the state. In

51

contrast, California's use tax law, like the use tax laws of other states, requires collection only by retailers "engaged in business in this state." Cal. Rev. & Tax. Code §6203(a).[20]

Plaintiffs cite no authority allowing this Court to add language to the CRRA to make it applicable only to agents with a sufficient California nexus. Federal courts cannot "rewrite [a state] law so it will pass constitutional muster." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1147 (9th Cir. 2001). Federal courts are also "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *ACLU of Nev. v. Heller*, 378 F.3d 979, 986 (9th Cir. 2004). Here, a narrowing construction of the CRRA is not reasonable or apparent, since the law applies by its terms to any agent who sells art for a California resident, regardless of any nexus between the agent and the state. *Id.* (no limitation was "'readily apparent' from the statute itself"); *accord United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 (1995) (the "obligation to avoid judicial legislation" prevented crafting a nexus requirement to limit a federal statute). In short, because the CRRA has no nexus

---

[20]    The use tax laws in the cases cited by Plaintiffs included similar nexus definitions. *Quill*, 504 U.S. at 302-03; *Nat'l Bellas Hess, Inc. v. Ill. Dep't of Revenue*, 386 U.S. 753, 754 (1967); *Scripto, Inc. v. Carson*, 362 U.S. 207, 208 (1960); *Nelson*, 312 U.S. at 361.

requirement, Plaintiffs' claims would be insufficient even if (1) the CRRA were a tax law, and (2) California could tax out-of-state sales—neither of which is true.

## III. THE DISTRICT COURT CORRECTLY RULED THAT THE CRRA'S UNCONSTITUTIONAL PROVISION CANNOT BE SEVERED

The District Court carefully evaluated whether "the offending portions of the CRRA [might be] severed" from the rest of the statute. ER22. The court recognized that the Act contains a severability provision. Cal. Civ. Code §986(e). However, after examining the legislative history of the CRRA, its purposes, and its functions, the court concluded that rewriting the CRRA without the out-of-state sales provision "would create a law that the legislature clearly never intended to create." ER24. As a result, the court held that Plaintiffs could not invoke the Act as a basis for its claims against the Auctions Houses, and it accordingly dismissed Plaintiffs' suits in their entirety. This determination was correct.

"Severability is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Under California law, an invalid portion of a statute "can be severed if, and only if, it is grammatically, functionally and volitionally separable." *Hotel Emps.*, 21 Cal.4th at 613. "[I]t is 'volitionally separable if it was not of critical importance to the measure's enactment." *Id*. Severing a statute is an exceptional act, and a court will reject a severance request where "[the court] cannot be certain that the Legislature would have enacted the measure without the

[offending] requirement." *County of Sonoma v. Superior Court*, 173 Cal.App.4th 322, 352 (2009).

As the District Court correctly determined, absent the out-of-state sales provision, the rest of the CRRA is *not* volitionally separate. When the bill that eventually became the CRRA was introduced, it would have applied only to sales within California. ER563, ER573. But the Legislature was warned that such a law would "encourage sellers to consign works to dealers and auction houses outside California." ER577-78. Accordingly, the bill was amended to encompass sales in which the seller was a California resident, ER581, a provision which remained in all future versions of the bill and which the Legislature adopted despite the admonition from its Legislative Counsel that it would give the law an impermissible extraterritorial scope. ER585. As the District Court explained, "the reason for the legislature's decision seems obvious: were the CRRA to apply *only* to sales occurring *in* California, the art market would surely have fled the state to avoid paying the 5% royalty." ER24 (emphasis in original).

Without the out-of-state sales provision, the CRRA would be in the same form as the original bill, which the California Legislature chose *not* to enact. If only that portion were struck, art sales would flee the state. No sensible legislature would desire such a result, and the California Legislature made exactly the opposite choice—all of which weighs strongly against a conclusion of severability

under California law.  *See County of Sonoma*, 173 Cal.App.4th at 352; *Barlow v. Davis*, 72 Cal.App.4th 1258, 1267 (1999) ("[W]hen the main purpose of a statute is defeated by the unconstitutionality of part of the act, the whole act is invalid.").

In arguing that the District Court should have rewritten the CRRA to excise the out-of-state provision, Plaintiffs rely almost exclusively on the Act's severability clause.  *See* Cal. Civ. Code §986(e).  But as Judge Nguyen recognized (ER53-55), under state law, "such a clause . . . while normally allowing severability, does not conclusively dictate it.  The final determination depends on whether the remainder . . . would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . ."  *Abbott Labs. v. Franchise Tax Bd.*, 175 Cal.App.4th 1348, 1357 (2009); *see also Metromedia, Inc. v. City of San Diego*, 32 Cal.3d 180, 190-91 (1982) (refusing to sever invalid provision despite severability clause where severance would "leave the city with an ordinance different than it intended, one less effective in achieving the city's goals").

In *Abbott*, the California Court of Appeals considered whether to sever the remainder of a tax-deduction provision after part of it had been invalidated based on the dormant Commerce Clause.  Although the relevant statute, like the CRRA, contained a severability clause, the Court of Appeals concluded that allowing the statute to stand without the offending portion would "cease[] to serve the function

intended by the legislature." 175 Cal.App.4th at 1358-59. It therefore declined to do so. *Id.*

The same result is required here. Plaintiffs offer no reason why the California Legislature would adopt a resale royalty law that covers only in-state sales. Nor could they because the Legislature was given the choice between such a commerce-killing law (the original version) and a law it was told violated the Commerce Clause (the current version), and it chose the latter. *See Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal.4th 231, 273 (2011) ("[T]he issue is whether a legislative body, knowing that only part of its enactment would be valid, would have preferred that part to nothing, or would instead have declined to enact the valid without the invalid."). Accordingly, the remainder of the Act is not volitionally separable.

Although California law is clear that the presence of a severability clause is not dispositive, Plaintiffs trumpet the timing of the addition of the CRRA's severability provision, noting it was added after the Legislative Counsel warned the Legislature that the out-of-state provision rendered the Act unconstitutional. But nothing in the legislative history cited by Plaintiffs (Plaintiffs' Br. at 50-51) indicates that the severability provision was added in response to the extraterritorial constitutionality concerns. To the contrary, the severability provision is described in the legislative history as one of five "relatively minor

amendments which do not violate the basic policy approved by both houses"—that is, the addition of the severability clause did *not* change the Legislature's intent to prevent an art market exodus from California with a purely intra-state Act. *See* ER772-73, 784-85.[21]

Plaintiffs' argument is also chronologically misleading. The severability provision was first proposed in a Conference Committee Report dated August 30, 1976. ER784-85. The full Legislature adopted the bill, as modified by the Conference Committee, on the following day, August 31, 1976. ER794-97. The Legislative Counsel's letter on which Plaintiffs rely is also dated August 30, 1976—the same day as the Conference Committee Report. ER786-92. Plaintiffs' argument thus assumes that on the same day the letter is dated, it was received and

---

[21]    This does not mean the severance provision is surplusage, however, because there are countless details as to which objections could be raised, and provisions of the Act severed. For example, before the severance provision was added, the Legislative Counsel and others objected to subsection (d)'s proposed application of the CRRA to "works of fine art created *before and* after its operative date," because it "violates the constitutional prohibitions against impairment of vested or contractual rights." *See* ER 691, 700, 741-42 (State Board of Equalization's objections to "undue interference with vested property rights"); Cal. Civ. Code §986(d). Other entities questioned the role of the California Arts Council in collecting and distributing the funds, as defined in subsection (a)(5), as improperly involving "state agencies" in "private contractual matters." *See* Cal. Civ. Code §986(a)(5); ER 741-42 (Board of Equalization opposition to bill); ER 605-06 (Department of Finance recommending veto of bill). And the State Board of Equalization flagged the CRRA's application to "sales made by auctions, galleries or museums vis-à-vis sales made by others" as potentially problematic—all before the addition of the severance clause. *See* Cal. Civ. Code §986 (a)(1); ER 741-42.

read and immediately prompted the Committee to adopt a severability clause. That scenario is implausible at best, and is insufficient to allow the court to "conclude with confidence" that the Legislature "would have preferred a [severed] version of the statute to invalidation of the statute." *Kopp v. Fair Political Practices Comm'n*, 11 Cal.4th 607, 615 (1995).

As the District Court recognized, the out-of-state provision is not "volitionally separable" because that provision was "of critical importance to the measure's enactment." *Hotel Emps.*, 21 Cal.4th at 613. *See* ER577, ER605-06, ER837 (expressing concern regarding impact of intra-state regulation on California art market). The court's decision not to sever the statute was therefore correct.

## IV. PLAINTIFFS' CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT

As the District Court held, Plaintiffs' claims were properly dismissed because they violate the Commerce Clause. But that is not the only infirmity in Plaintiffs' CRRA claims. Since issuance of the District Court's decision, the Supreme Court has reiterated the "first sale" principles of the Copyright Act of 1976. *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2013). The Copyright Act preempts Plaintiffs' claims.

Congress enacted the Copyright Act of 1976 with the "express objective of creating national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation." *Cmty. for Creative Non-Violence v. Reid*, 490

U.S. 730, 740 (1989). The Copyright Act strikes a careful balance between the distribution rights of copyright holders (such as visual artists) and the free flow of copyrighted works. A crucial component of this balance is the "first-sale" doctrine, which recognizes a creator's exclusive right to sell his or her work, 17 U.S.C. §106(3), but also limits the restraints that the creator can place on its subsequent alienation, *see id.* §109(a).

The CRRA runs headlong into the Copyright Act's carefully structured regime through its "structure and purpose." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007). Under the first-sale doctrine, once a visual artist sells a painting or sculpture, the artist loses the ability to control further sales. But the CRRA dictates the terms of downstream transactions and gives the artist a financial interest in each sale, putting the CRRA in conflict with the Copyright Act.

At the same time, the CRRA also purports to create distribution rights equivalent to those protected by the Copyright Act, running afoul of the Copyright Act's separate express-preemption provision, 17 U.S.C. §301(a).

For both of these reasons, preemption of Plaintiffs' claims provides an alternative, independent basis for affirmance.[22]

### A. Plaintiffs' Claims Conflict With The Copyright Act's First-Sale Doctrine.

Conflict preemption arises "when a state requirement stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Stengel*, 704 F.3d at 1231. Congress intended federal copyright legislation to have a sweeping preemptive scope. *Reid*, 490 U.S. at 740. Accordingly, state laws must "yield to the extent that [they] clash[] with the balance struck by Congress," a federal judgment that "the States may [not] second-guess." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989) (patent); *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 429 (1984)

---

[22] "Although the district court did not reach this issue, [this Court] may affirm the district court's dismissal on any ground supported by the record." *Gemtel Corp. v. Cmty. Redevelopment Agency of L.A.*, 23 F.3d 1542, 1546 (9th Cir. 1994). Plaintiffs' reliance on *Singleton v. Wulff*, 428 U.S. 106 (1976), is misplaced. *See* Plaintiffs' Br. at 4, n.2. *Singleton* explained the "general rule . . . that a federal appellate court does not consider an issue not passed upon below." 428 U.S. at 120. But when the appellant had "the opportunity to present whatever legal arguments he may have" against the ground urged for affirmance, an appellate court may affirm on that ground, even if it was not addressed by the court below. *Id.* at 121. Here, Plaintiffs briefed the preemption issue below, and this Court may affirm on the ground that the Copyright Act preempts Plaintiffs' claims. *See, e.g.*, *Smith v. Phillips*, 455 U.S. 209, 215 n.6 (1982).

(recognizing Congress's attempt to strike a "difficult balance" in the Copyright Act).

Through the first-sale doctrine, Congress enshrined a careful balance between creator control and the free trade in copyrighted works. By imposing additional downstream obligations on the resellers of copyrighted works, the CRRA upsets this equilibrium.

**B.** **The First-Sale Doctrine Forbids Restraints On The Resale Of Copyrighted Works.**

The first-sale doctrine precludes a copyright owner from controlling the resale of his work once he has initially transferred title. "The whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998); *see also Kirtsaeng*, 133 S.Ct. at 1363; *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1179 (9th Cir. 2011).

As the Supreme Court recently emphasized, "for at least a century the 'first sale' doctrine has played an important role in American copyright law." *Kirtsaeng*, 133 S.Ct. at 1363. The doctrine's "impeccable historic pedigree" traces back at least as far as Lord Coke's seventeenth century writings on "the common law's refusal to permit restraints on the alienation of chattels." *Id.* Congress

codified the first-sale doctrine in the Copyright Act of 1909, subsequently reaffirming it in the Copyright Act of 1976. *Id*. at 1360-61.

The Copyright Act grants a copyright owner "exclusive rights" over the first sale of a copyrighted work. The owner may "distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership." 17 U.S.C. §106(3).[23] But the Act carefully circumscribes this right through a "first-sale" provision:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy . . . lawfully made under this title . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy.

*Id.* §109(a). The statute thus proscribes a copyright owner from controlling a copyrighted item's downstream distribution, and bars him or her from dictating the terms of any subsequent sale. "[O]nce a copyright owner consents to release a copy of a work to an individual . . . , the copyright owner relinquishes *all rights* to that particular copy." *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 373 (6th Cir. 2007). Thus, "once a copy of [a copyrighted work] has been lawfully sold . . . , the buyer of that copy and subsequent owners are free to

---

[23]    The Copyright Act defines "copies" to include "the material object, other than a phonorecord, in which the work is first fixed." 17 U.S.C. § 101. An original painting or sculpture is thus a "copy" within the meaning of the Copyright Act.

dispose of it *as they wish*." *Kirtsaeng*, 133 S.Ct. at 1355 (emphasis altered).
Indeed, stressing the sweeping breadth of the first-sale doctrine, the Supreme Court
has ridiculed as "absurd" the position that a "copyright owner can exercise
downstream control even when it authorized the . . . first sale." *Id.* at 1366.[24]

Practical considerations underscore the need to apply the first-sale doctrine
with rigor. In its recent decision in *Kirtsaeng*, the Supreme Court considered
whether the first-sale doctrine applies only to goods made in the United States or
whether it instead extends more broadly to all goods "made 'in accordance with' or
'in compliance with' the Copyright Act." *Id.* at 1358. The Court concluded that
the latter, broader interpretation is correct. *Id.* In rejecting a geographic limitation,
the Supreme Court emphasized that a narrow interpretation would produce
"intolerable consequences." *Id.* at 1366. Reading the first-sale doctrine to protect
only buyers of domestically created and sold copyrighted works could "require . . .
museums to obtain permission from the copyright owners before they could
display the work," yielding administrative headaches "if the artist retained the

---

[24]     The legislative history of the Copyright Act confirms the doctrine's
expansive sweep. *See* H.R. Rep. No. 94-1476, at 79 (1976) ("Under [§109(a), the
first sale doctrine], . . . the copyright owner's exclusive right of public distribution
would have *no effect* upon anyone who owns a 'particular copy . . . lawfully made
under this title' and who wishes to transfer it to someone else . . . . Thus, for
example, the outright sale of an authorized copy of a book frees it from any
copyright control over its resale price *or other conditions of its future
disposition*."); *see also* S. Rep. No. 94-473 (1975).

copyright, if the artist cannot be found, or if a group of heirs is arguing about who owns which copyright." *Id.* at 1365. This example "help[s] explain *why* American copyright law has long applied" the first-sale doctrine. *Id.* at 1366 (emphasis in original). Given the long-standing protection, a regime requiring prospective buyers and sellers to locate the copyright owner when conducting a downstream transaction would amount to "a dramatic change" in the law. *Id.*

## C. The CRRA Conflicts With The First-Sale Doctrine.

By obligating resellers of fine art to locate and compensate the original copyright owner, the CRRA restrains the very downstream transactions that the Copyright Act intends to be unrestricted. Indeed, the CRRA explicitly applies *only* to such downstream sales. *See* Cal. Civ. Code §986(b)(1) (requirements do not apply "[t]o the initial sale of a work of fine art"). And not only does the Act apply beyond the *first* sale, it controls all future sales until twenty years after the artist's death. *See id.* §986(a)(7). The CRRA thus violates the first-sale doctrine, disrupting the Copyright Act's delicate equilibrium.

For over a century, the Supreme Court has recognized that a copyright owner's financial rights in the sale of a particular copy of work are limited to receipt of a "satisfactory price" for an initial transfer. *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 349-50 (1908). The first-sale doctrine "rest[s] on the principle that the copyright owner is entitled to realize no more and no less than the full value of

each copy . . . upon its disposition." *Parfums Givenchy, Inc. v. C&C Beauty Sales, Inc.*, 832 F.Supp. 1378, 1389 (C.D. Cal. 1993); *see also Brilliance Audio*, 474 F.3d at 373 (stating that the aim of copyright distribution rights are achieved once "the owner has received the desired compensation" for a particular copy).

By giving a copyright owner royalty rights in downstream sales, the CRRA interferes with the economic equilibrium that underpins the Copyright Act. After the initial sale, the CRRA demands payment "[w]henever a work of fine art is sold and the seller resides in California or the sale takes place in California." Cal. Civ. Code §986(a). The CRRA confers an unwaivable right on copyright owners to receive a royalty from any resale of their works of fine art. The Supreme Court has recently observed that such a regime would be a blatant violation of the first-sale doctrine. *See Kirtsaeng*, 133 S.Ct. at 1366. Once the creator places the art "in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Quality King*, 523 U.S. at 152.

The first-sale doctrine ensures that the purchaser of a copyrighted work may transfer it free from statutory constraints. *Brilliance Audio*, 474 F.3d at 371. To achieve this objective, the Copyright Act forces a copyright owner to "relinquish[] *all rights* to the particular copy" once he "consents to release [the copy] to an individual." *Id.* at 373. The CRRA, however, permits subsequent owners to transfer a work of fine art only if they pay a 5% royalty to the copyright owner (or

to the California Arts Council if the copyright owner cannot be located). The statute thus imposes a constraint on resale, in direct contravention of the Copyright Act. Leading treatises accordingly have concluded that the Copyright Act preempts the CRRA. *See* 2 Nimmer on Copyright §8C.04 (rev. ed. 2013); 2 William F. Patry, *Copyright Law and Practice* 1129 n.235 (1994) ("[T]he [resale royalty] right clearly conflicts with § 109 of the Copyright Act, which generally exhausts the copyright owner's rights with respect to a particular copy once that copy is lawfully distributed.").

This Court's decision in *Morseburg v. Balyon*, 621 F.2d 972 (9th Cir. 1980), does not save the CRRA from preemption. *Morseburg* "emphasize[d] that this case concerns the preemptive effect of the 1909 Act only," not the 1976 Act. *Id.* at 975. To be sure, this Court subsequently observed that the first-sale doctrine in the 1909 Act and the current §109(a) are "substantively identical." *UMG Recording*, 628 F.3d at 1182 n.7. But the *Morseburg* Court emphasized more than once that its "holding, as well as [its] reasons, to repeat, [were] addressed to the 1909 Act only." 621 F.2d at 975. This Court is not bound by the decision in interpreting the current Copyright Act.

More fundamentally, subsequent Supreme Court precedent has severely eroded the foundation of *Morseburg*, which was decided more than thirty years ago. *Morseburg* stated that, "[t]echnically speaking [resale royalty] acts in no way

restrict the transfer of art works" because "[n]o lien to secure the royalty is attached to the work itself, nor is the buyer made secondarily liable for the royalty." *Id.* at 977-78. Intervening Supreme Court decisions, however, have overturned this restrictive interpretation of the first-sale doctrine. In *Quality King*, the Supreme Court overturned the "cramped reading" that this Court had endorsed, emphasizing that Congress meant to give the doctrine a "broad scope." 523 U.S. at 152 (overruling 98 F.3d 1109 (9th Cir. 1996)). The *Kirtsaeng* Court likewise rejected as "absurd" the argument embraced by this Court that "the copyright owner can exercise downstream control" after the first sale. 133 S.Ct. at 1366.

These Supreme Court decisions establish that the first-sale doctrine does more than merely prevent outright bars on the transfer of copyrighted works, as this Court had concluded in *Morseburg*. Rather, the Copyright Act forbids statutory provisions that vest rights in copyright holders extending past the first sale and imposing downstream obligations on resellers. As elucidated in recent Supreme Court decisions, *Morseburg* does not control this case.

*Morseburg* is at odds with later Supreme Court precedent for another reason: It impermissibly ignored the potential consequences when it construed the first-sale doctrine. The *Morseburg* Court acknowledged the many ways in which a resale royalty might diminish the market for fine art, but then "explicitly" declined to take them into account. 621 F.2d at 978. In *Kirtsaeng*, however, the Supreme

Court made clear such potential ramifications bear directly on the doctrine's scope and cannot be ignored. *See* 133 S.Ct. at 1366-67. *Kirtsaeng* rejected a narrow interpretation of the first-sale doctrine in part because of the "intolerable consequences," "dramatic change," and "complex permission-verifying process" that such an interpretation would produce generally (not just for the specific transaction at issue in that case). *Id*.

So too here. To comply with the CRRA, auction houses must determine the seller's residency; determine how much the seller originally paid to obtain the artwork, identify the artist; and ascertain the artist's citizenship. For each qualifying sale, the auction house must locate the artist and arrange payment or, if unable to do so, transfer the royalty to the California Arts Council. Uncertainty clouds each transaction, with a seller's potential liability extending at least three years after the sale, and the artist's rights inuring to his or her heirs for twenty years after death. *See generally supra* pp. 3-5, 27. Enforcement of the CRRA thus has the potential to impose prohibitive restraints on art sellers and impede "the free flow of ideas, information, and commerce" that the Copyright Act is designed to promote. *Sony Corp.*, 464 U.S. at 429. The obstacles erected by the CRRA are all the more prominent given that no other state has adopted a similar royalty statute, rendering the CRRA a singular threat to the Copyright Act's "express objective of

creating national, uniform copyright law." *Reid*, 490 U.S. at 740. California's statute is pre-empted by the first-sale doctrine.

### D. The Copyright Act Expressly Preempts Plaintiffs' Claims.

In *addition* to the first-sale provision, the Copyright Act includes an express-preemption provision:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. §301(a). Express preemption is assessed under a two-part test. First, the Court must "determine whether the 'subject matter' of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§102 and 103." *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006). Second, the Court "must determine whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. §106, which articulates the exclusive rights of copyright holders." *Id.* at 1138.

Applying that test, Plaintiffs' claims are expressly preempted. Plaintiffs allege that the Auction Houses violated state law by failing to compensate them for distribution of their copyrighted work. But the Copyright Act already provides a

copyright owner with distribution rights. The CRRA thus impermissibly creates rights "equivalent to" those protected by the Copyright Act.

### 1. Plaintiffs' Claims Fall Within The Subject Matter Of The Copyright Act.

Plaintiffs' claims rest on the alleged failure to pay required royalties from the resale of fine art. As discussed above, the "fine art" regulated by the CRRA is also regulated by the Copyright Act. *See supra* n. 23. Plaintiffs' claims thus easily "fall[] within the subject matter of copyright," satisfying the first prong of the express-preemption test. *See Laws*, 448 F.3d at 1137.

### 2. Plaintiffs Allege Violations Of State-Law Rights Equivalent To Rights Contained In The Copyright Act.

If a state-law claim falls within the subject matter of the Copyright Act, it is preempted unless it "protect[s] rights which are qualitatively different from the copyright rights." *Id.* at 1143. "The state claim must have an extra element which changes the nature of the action." *Id.* Courts "take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). Attention must be paid to the "essence" of the state-law claim; the addition of elements to a federal copyright

claim is insufficient to avoid preemption if the state cause of action is simply "part and parcel of a copyright claim." *Laws*, 448 F.3d at 1144.[25]

Invoking a state-law cause of action, Plaintiffs here assert nothing more than copyright claims for violation of exclusive-distribution rights. The Copyright Act confers on copyright owners "the exclusive rights . . . to distribute their works by sale or rental." *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1106–07 (9th Cir. 2010). A copyright owner's financial interest in a copyrighted work is subsumed within the broader exclusive-distribution right. *Brilliance Audio*, 474 F.3d at 373.

The CRRA thus simply creates an additional exclusive-distribution right—equivalent to that protected by the Copyright Act—and runs headlong into the preemptive force of §301(a). The "essence" of Plaintiffs' claims is that, by failing to compensate them with royalty fees, the Auction Houses violated their right to distribute their works of art. This is a garden-variety federal copyright claim. *See Vernor*, 621 F.3d at 1106–07.

---

[25]    In *Baby Moose Drawings, Inc. v. Valentine*, 2011 WL 1258529, at *3 (C.D. Cal. Apr. 1, 2011), Judge Nguyen held that the Copyright Act's express preemption clause did not provide an unequivocal basis to remove that case to federal court. But that decision did not address whether the Copyright Act preempts the CRRA under the more limited preemption principles presented where federal jurisdiction is not contested. Indeed, at the hearing below, Judge Nguyen acknowledged the inapplicability of *Baby Moose* here because it is "limited [to] a remand situation," and rejected Plaintiffs' reliance on it. ER166:7-10.

The elements added to a CRRA cause of action do not save Plaintiffs' claims from preemption. "Although the elements of [Plaintiffs'] state law claims may not be identical to the elements in a copyright action, the underlying nature of [Plaintiffs'] state law claims is part and parcel of a copyright claim." *Laws*, 448 F.3d at 1144. None of the "extra elements" of Plaintiffs' CRRA claims—the presence of a California resident or sale, a sales price of over $1,000, and a sales price greater than the seller's purchase price—"transform[s] the nature of the action" into anything more than a copyright claim. *Id*.

The CRRA thus conflicts with the Copyright Act's express preemption provision. As with the first-sale provision, the federal copyright statute, rather than the state's CRRA, must prevail.

## **CONCLUSION**

The judgment of the District Court should be affirmed.


Respectfully submitted,


_____s/ Jason D. Russell_____


_____s/ Paul T. Friedman_____


August 2, 2013


| | | |
|---|---|---|
| JASON D. RUSSELL | STEVEN A. REISS | PAUL T. FRIEDMAN |
| HILLARY A. HAMILTON | HOWARD B. COMET | DEANNE E. MAYNARD |
| ALLON KEDEM | WEIL, GOTSHAL & | MORRISON & FOERSTER LLP |
| MICHAEL MCINTOSH | MANGES LLP | 425 Market Street |
| SKADDEN, ARPS, SLATE, | 767 Fifth Avenue | San Francisco, CA 94105 |
| MEAGHER & FLOM LLP | New York, NY 10153 | Tel: 415.268.7000 |
| 300 South Grand Avenue | Tel: 212.310.8000 | Fax: 415.268.7522 |
| Suite 3400 | Fax: 212.310.8007 | |
| Los Angeles, CA 90071 | | Attorneys for Appellee |
| Tel: 213.687.5000 | Attorneys for Appellee | Sotheby's, Inc. |
| Fax: 213.687.5600 | Sotheby's, Inc. | |

Attorneys for Appellee
Christie's, Inc.

## STATEMENT OF RELATED CASES

In accordance with Ninth Circuit Rule 28-2.6, Appellees state that they are not aware of any related cases within the meaning of the Rule, other than the cases that are consolidated in this appeal.

Respectfully submitted,

_s/ Jason D. Russell_

_s/ Paul T. Friedman_

August 2, 2013

JASON D. RUSSELL
HILLARY A. HAMILTON
ALLON KEDEM
MICHAEL MCINTOSH
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
300 South Grand Avenue
Suite 3400
Los Angeles, CA 90071
Tel: 213.687.5000
Fax: 213.687.5600

Attorneys for Appellee
Christie's, Inc.

STEVEN A. REISS
HOWARD B. COMET
WEIL, GOTSHAL &
MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: 212.310.8000
Fax: 212.310.8007

Attorneys for Appellee
Sotheby's, Inc.

PAUL T. FRIEDMAN
DEANNE E. MAYNARD
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel: 415.268.7000
Fax: 415.268.7522

Attorneys for Appellee
Sotheby's, Inc.

# CERTIFICATE OF COMPLIANCE

In accordance with Ninth Circuit Rule 32-1, Appellees hereby certify that this brief is accompanied by a motion for leave to file an oversize brief pursuant to Ninth Circuit Rule 32-2 and is 18,755 words, excluding the portions exempted by Fed. R.App. P. 32(a)(7)(B)(iii). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Respectfully submitted,

s/ Jason D. Russell

s/ Paul T. Friedman

August 2, 2013

| | | |
|---|---|---|
| JASON D. RUSSELL | STEVEN A. REISS | PAUL T. FRIEDMAN |
| HILLARY A. HAMILTON | HOWARD B. COMET | DEANNE E. MAYNARD |
| ALLON KEDEM | WEIL, GOTSHAL & | MORRISON & FOERSTER LLP |
| MICHAEL MCINTOSH | MANGES LLP | 425 Market Street |
| SKADDEN, ARPS, SLATE, | 767 Fifth Avenue | San Francisco, CA 94105 |
| MEAGHER & FLOM LLP | New York, NY 10153 | Tel: 415.268.7000 |
| 300 South Grand Avenue | Tel: 212.310.8000 | Fax: 415.268.7522 |
| Suite 3400 | Fax: 212.310.8007 | |
| Los Angeles, CA 90071 | | Attorneys for Appellee |
| Tel: 213.687.5000 | Attorneys for Appellee | Sotheby's, Inc. |
| Fax: 213.687.5600 | Sotheby's, Inc. | |
| Attorneys for Appellee | | |
| Christie's, Inc. | | |

# **ADDENDUM**

1.    Cal. Civ. Code § 986 ................................................................76



**Effective:[See Text Amendments]**

West's Annotated California Codes Currentness
  Civil Code (Refs & Annos)
    Division 2. Property (Refs & Annos)
      Part 3. Personal or Movable Property
        Title 2. Particular Kinds of Personal Property
          Chapter 3. Products of the Mind (Refs & Annos)
          ➜➜ **§ 986. Work of fine art; sale; payment of percentage to artist or deposit for Arts Council; failure to pay; action for damages; exemptions**

(a) Whenever a work of fine art is sold and the seller resides in California or the sale takes place in California, the seller or the seller's agent shall pay to the artist of such work of fine art or to such artist's agent 5 percent of the amount of such sale. The right of the artist to receive an amount equal to 5 percent of the amount of such sale may be waived only by a contract in writing providing for an amount in excess of 5 percent of the amount of such sale. An artist may assign the right to collect the royalty payment provided by this section to another individual or entity. However, the assignment shall not have the effect of creating a waiver prohibited by this subdivision.

(1) When a work of fine art is sold at an auction or by a gallery, dealer, broker, museum, or other person acting as the agent for the seller the agent shall withhold 5 percent of the amount of the sale, locate the artist and pay the artist.

(2) If the seller or agent is unable to locate and pay the artist within 90 days, an amount equal to 5 percent of the amount of the sale shall be tranferred [FN1] to the Arts Council.

(3) If a seller or the seller's agent fails to pay an artist the amount equal to 5 percent of the sale of a work of fine art by the artist or fails to transfer such amount to the Arts Council, the artist may bring an action for damages within three years after the date of sale or one year after the discovery of the sale, whichever is longer. The prevailing party in any action brought under this paragraph shall be entitled to reasonable attorney fees, in an amount as determined by the court.

(4) Moneys received by the council pursuant to this section shall be deposited in an account in the Special Deposit Fund in the State Treasury.

(5) The Arts Council shall attempt to locate any artist for whom money is received pursuant to this section. If the council is unable to locate the artist and the artist does not file a written claim for the money received by the council within seven years of the date of sale of the work of fine art, the right of the artist terminates and such money shall be transferred to the council for use in acquiring fine art pursuant to the Art in Public Buildings program set forth in Chapter 2.1 (commencing with Section 15813) of Part 10b of Division 3 of Title 2, of the Government Code.

(6) Any amounts of money held by any seller or agent for the payment of artists pursuant to this section shall be exempt from enforcement of a money judgment by the creditors of the seller or agent.

(7) Upon the death of an artist, the rights and duties created under this section shall inure to his or her heirs, legatees, or personal representative, until the 20th anniversary of the death of the artist. The provisions of this paragraph shall be applicable only with respect to an artist who dies after January 1, 1983.

(b) Subdivision (a) shall not apply to any of the following:

(1) To the initial sale of a work of fine art where legal title to such work at the time of such initial sale is vested in the artist thereof.

(2) To the resale of a work of fine art for a gross sales price of less than one thousand dollars ($1,000).

(3) Except as provided in paragraph (7) of subdivision (a), to a resale after the death of such artist.

(4) To the resale of the work of fine art for a gross sales price less than the purchase price paid by the seller.

(5) To a transfer of a work of fine art which is exchanged for one or more works of fine art or for a combination of cash, other property, and one or more works of fine art where the fair market value of the property exchanged is less than one thousand dollars ($1,000).

(6) To the resale of a work of fine art by an art dealer to a purchaser within 10 years of the initial sale of the work of fine art by the artist to an art dealer, provided all intervening resales are between art dealers.

(7) To a sale of a work of stained glass artistry where the work has been permanently attached to real property and is sold as part of the sale of the real property to which it is attached.

(c) For purposes of this section, the following terms have the following meanings:

(1) "Artist" means the person who creates a work of fine art and who, at the time of resale, is a citizen of the United States, or a resident of the state who has resided in the state for a minimum of two years.

(2) "Fine art" means an original painting, sculpture, or drawing, or an original work of art in glass.

(3) "Art dealer" means a person who is actively and principally engaged in or conducting the business of selling works of fine art for which business such person validly holds a sales tax permit.

(d) This section shall become operative on January 1, 1977, and shall apply to works of fine art created before and after its operative date.

(e) If any provision of this section or the application thereof to any person or circumstance is held invalid for any reason, such invalidity shall not affect any other provisions or applications of this section which can be effected, without the invalid provision or application, and to this end the provisions of this section are severable.

(f) The amendments to this section enacted during the 1981-82 Regular Session of the Legislature shall apply to transfers of works of fine art, when created before or after January 1, 1983, that occur on or after that date.

CREDIT(S)

(Added by Stats.1976, c. 1228, p. 5542, § 1. Amended by Stats.1982, c. 497, p. 2136, § 7, operative July 1, 1983; Stats.1982, c. 1609, p. 6433, § 1.5.)

[FN1] So in chaptered copy.

VALIDITY

*For validity of this section, see* Estate of Graham v. Sotheby's Inc., C.D.Cal.2012, 860 F.Supp.2d 1117.

LEGISLATIVE COMMITTEE COMMENTS--ASSEMBLY

1982 Amendment

Section 986(a) (6) is amended to conform to the terminology of Title 9 (commencing with Section 680.010) of Part 2 of the Code of Civil Procedure (Enforcement of Judgments Law). The reference to attachment has been deleted as unnecessary because Code of Civil Procedure Section 487.020 incorporates for attachment the exemptions from enforcement of a money judgment. Subdivision (b) (6) is added to make clear that the artist has no right to receive a percentage of proceeds from the sale of a work of art to satisfy a money judgment (15 Cal.L.Rev.Comm. Reports 2001; 82 A.J. 9356).

HISTORICAL AND STATUTORY NOTES

2007 Main Volume

Section 2 of Stats.1976, c. 1228, p. 5544, provides:

"The rights of an artist of a work of fine art to receive payment of an amount equal to 5 percent of the amount of a sale of fine art within the provisions of § 986 shall be vested at the time of such sale; except that an artist shall have no rights to any payment pursuant to this act, if any provision therein is subsequently repealed so as to remove the provisions for such payment, as to any sale which occurs subsequent to such repeal; and except that, in the event any provision in this act is otherwise subsequently amended or changed, an artist shall have only those rights to payment provided for by such subsequent amendment or change and shall have no rights to any payment pursuant to this act, as to any sale which occurs subsequent to such amendment or change."

The 1982 amendment neutralized gender references; deleted "is not transferable and" preceding "may be waived" in the second sentence of subd. (a); added the third and fourth sentences of subd. (a); inserted "fine" preceding "art" in subd. (a) (1); added the last sentence of subd. (a) (3); substituted "council for use in acquiring fine art pursuant to the Art in Public Buildings program set forth in Chapter 2.1 (commencing with Section 15813) of Part 10b of Division 3 of Title 2, of the Government Code" for "operating fund of the council as reimbursement to fund programs of the

West's Ann.Cal.Civ.Code § 986                                                              Page 79

council" at the end of subd. (a) (5); substituted "enforcement of a money judgment" for "attachment or execution of judgment" in subd. (a) (6); added subd. (a) (7); added the exception to subd. (b) (3); added subds. (b) (6) and (b) (7); added the citizenship or residency requirement to subd. (c) (1); added "or an original work of art in glass" to subd. (c) (3); and added subd. (f).

Amendment of this section by §§ 1 to 4 of Stats.1982, c. 1601, p. 6380, failed to become operative under the provisions of § 5 of that Act.

Amendment of this section by § 1 of Stats.1982, c. 1609, p. 6432, failed to become operative under the provisions of § 4 of that Act.

Effect of amendment of section by two or more acts at the same session of the legislature, see Government Code § 9605.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 2, 2013.

I certify that counsel of record in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:  August 2, 2013            By:_____s/ Jason D. Russell